<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

|  |  |  |
|---|---|---|
| TORMU E. PRALL, | : | |
| | : | |
| Plaintiff, | : | Civil No. 10-1228 (FLW) |
| | : | |
| v. | : | |
| | : | **OPINION** |
| JOSEPH L. BOCCHINI, JR., | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |

---

**APPEARANCES:**

> TORMU E. PRALL, Plaintiff <u>pro se</u>
> # 700294B/650739
> New Jersey State Prison
> P.O. Box 861
> Trenton, New Jersey 08625

**WOLFSON**, District Judge

Plaintiff, Tormu E. Prall ("Plaintiff" or "Prall"), a state inmate confined at the New Jersey State Prison in Trenton, New Jersey, at the time he submitted the above-captioned Complaint for filing, seeks to bring this action <u>in forma pauperis</u> ("IFP"). This matter was administratively terminated by Opinion and Order entered by this Court on August 16, 2010, on the ground that Plaintiff could not proceed IFP pursuant to the three-strike provision of 28 U.S.C. § 1915(g). (Docket entry nos. 10 and 11). Plaintiff appealed the Court's Order, and on April 28, 2011, the United States Court of Appeals for the Third Circuit issued a

judgment and mandate vacating this Court's April 16, 2010 Order, and remanding the matter for granting of the IFP application (based on a showing of imminent danger under 28 U.S.C. § 1915(g)), and screening of the Complaint and Amended Complaint pursuant to 28 U.S.C. § 1915(e).  (Docket entry no. 21).

Accordingly, this Court will direct the Clerk of the Court to reopen this matter, and pursuant to the Third Circuit's ruling, this Court will grant plaintiff's application to proceed IFP, and order the Clerk of the Court to file the Complaint. Further, this Court must review the Complaint, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, to determine whether the action should be dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it seeks monetary relief from a defendant who is immune from such relief.  For the reasons set forth below, the Court concludes that the Complaint will proceed in part.

In addition, with respect to Prall's motion for preliminary injunctive relief (Docket entry no. 18), the Court will direct the relevant defendants to respond in writing to this Court, within ten (10) days from the date the accompanying Order is issued, as to plaintiff's allegations of ongoing physical abuse.

## I.   BACKGROUND

Plaintiff brings this civil action, pursuant to 42 U.S.C. § 1983.  In his initial Complaint, Prall named the following defendants: Joseph L. Bocchini, Jr., the Mercer County

2

Prosecutor; Arthur R. Sypek, Jr., Mercer County Counsel; Charles Ellis, Warden of the Mercer County Correctional Center ("MCCC"); Phyllis Oliver, Internal Affairs Investigator at MCCC; and Michelle R. Ricci, Administrator of the New Jersey State Prison ("NJSP").  (Complaint at Caption and ¶¶ 3-7).  On July 1, 2010, Prall submitted an Amended Complaint (Docket entry no. 5) adding the following defendants: Teresa Blair, Attorney General for the State of New Jersey; Brian Hughes, Mercer County Executive; Kelvin S. Ganges, Mercer County Chief of Staff; Andrew A. Mair, Mercer County Administrator; Joseph P. Blaney, Assistant Mercer County Counsel; Sarah G. Crowley, Deputy County Counsel; Sgt. J. McCall at MCCC; E. William, Correctional Officer at MCCC; T. Wilkie, Correctional Officer at MCCC; Pete S., Nurse at MCCC; Sgt. K. Morris at MCCC; Dr. Robert Roth at the Ann Klein Forensic Center ("AKFC"); Dr. Gooriah at AKFC; Social Worker Lydia at AKFC; William J. Moliens, Associate Administrator at NJSP; Chris Holmes, Assistant Superintendent at NJSP; Jimmy Barnes, Assistant Superintendent at NJSP; James Drumm, Assistant Superintendent at NJSP; Ron Wagner, Assistant Superintendent at NJSP; James Keil, Chief of Custody at NJSP; Lt. Alaimo at NJSP; Crystal Raupp, Social Worker at NJSP; Ishmael, school teacher at NJSP; Shirley Stephens, Supervisor of Education at NJSP; Flora J. Defilippo, mental health doctor at NJSP; Sgt. Ortiz at NJSP; Captain Ortiz at NJSP; John Does 1-25, unknown named Mercer County Correction Officers; John Moes 1-10, unknown named Unit Manager and nurses

3

at AKFC; and John Roes 1-99, unknown named corrections officers, supervisors and Special Investigation Division ("SID") investigators at NJSP.  (Amended Complaint at ¶¶ 5, 6, 7, 9, 10, 11, 14-21, 23-38).  The following factual allegations, taken from the Complaint and Amended Complaint, are accepted for purposes of this screening only.  The Court makes no findings as to the veracity of plaintiff's allegations.

In his initial Complaint, Prall alleges that he was incarcerated at the MCCC from October 22, 2008 to February 5, 2010, and remained free of disciplinary infractions for well over a year.  During that time, he filed several actions in state court on his own behalf and helped other inmates to file similar actions.  Prall's actions claimed that he is a conscientious objector to the "State's irrational system of criminal justice" and the conditions of his confinement.  (Compl., ¶¶ 9, 10).

Prall alleges that, on December 12, 2009, the county defendants directed unnamed correctional officers to attack Plaintiff in his cell at MCCC, deny him medical care for his injuries and falsely charge him with disciplinary charges to cover up their actions.  Prall also alleges that the County Defendants privately influenced state judges to depart from state law and sentence Plaintiff to prison on February 5, 2010, without regard to Plaintiff's sincerely held conscientious objection to the state criminal proceedings against him.  (Compl., ¶¶ 12, 13).

Prall was transferred to the Management Control Unit ("MCU") at NJSP and was placed in a close/camera watch cell for more than three weeks with only a gown and a mattress on the floor. He was not given anything to clean the blood and feces on the floor and walls in his cell, forcing him to walk on the floor in bare feet. Prall complained about these conditions, namely, that his skin was itching from not taking showers, his feet "felt terrible," and that he was not given any cleaning products for his cell. He also complained about the correctional officers who "slap, joke, punch, kick, club and threaten" and who physically and mentally attack Plaintiff. Prall alleges that he covered the camera in his cell so that SID would bring a video recorder to document the abuse. (Compl., ¶ 14).

After three weeks on close/camera watch, Prall was placed in a regular cell in the MCU. However, Prall was not given a blanket, sheets, slippers or shoes, "draws", towels, wash rag, hygiene supplies, exercise, emergency canteen and legal assistance that were provided to other inmates. Prall further alleges that the corrections officers continue to "physically and mentally abuse him until he "renounces his conscientious beliefs." He complains that inmate paralegals are not permitted to stop at Plaintiff's cell or assist him upon request; that his grievances are not accepted and are ignored; and that his personal property, including his legal documents, have been seized and withheld from him. (Compl., ¶ 15).

In his Amended Complaint, Prall alleges that, in October 2006, he was arrested for eluding, resisting arrest, and assault on police officers.  He claims that a person named Alexis Bell had visited Plaintiff in MCCC and appeared in state court to "announce that police framed Prall on the charges."  Prall contends that defendant Galuchie was present when this occurred.  Prall also alleges that Bell filed an affidavit with the Mercer County Public Defender's Office, which declares that Prall was innocent and that the police set him up.  (Amended Compl., ¶ 41).

Prall states that after he was "released" from jail in May 2007,[1] he continued his contact with Alexis Bell.  However,

---

[1]  This Court takes judicial notice of Prall's flight from prosecution, which was documented in a criminal complaint filed in this District Court on August 26, 2008, United States v. Prall, Mag. No. 08-M-1127 (JJH), stating that:

> On or about September 26, 2007 in the District of New Jersey and elsewhere, the defendant, Tormu Prall, did knowingly and wilfully move and travel in interstate and foreign commerce with the intent to avoid prosecution under the laws of the place from which he fled, namely, New Jersey, for a crime which is a felony under the laws of that State, specifically, homicide, contrary to N.J.S.A. 2C:11-3a(3).

The criminal investigator with the United States Marshals Service filed the criminal complaint alleging that Prall's flight was a violation of 18 U.S.C. § 1073.  The complaint was based on the following facts from the investigator's reports and involvement with this fugitive investigation, filed as Attachment B to the criminal complaint:

> 1.  On or about September 25, 2007, John Prall was killed when he was burned during an arson which was committed at a residence in Mercer County, New Jersey.
> 2.  On or about October 10, 2007, a criminal complaint was filed against defendant Tormu Prall in Mercer County Superior Court, charging him with the New Jersey state felony offense of homicide, contrary to N.J.S.A. 2C:11-3a(3).  Pursuant to that complaint, a warrant for the arrest of defendant Prall was issued.

because of his conscientious objection to the state criminal
justice system, Prall declined to participate in the state
criminal proceedings against him, and a trial went forward in his

---

3.  Following the homicide referenced in Paragraph 1 above,
the United States Marshals Service and the Trenton Police
Department conducted numerous interviews of associates and
family members of defendant Tormu Prall.  This extensive
investigation conducted by law enforcement authorities to
locate Prall in the State of New Jersey has been met with
negative results.

4.  On May 17, 2008, Prall was arrested by local police in
Boston, Massachusetts on charges of drinking in public.  At
the time of his arrest, Prall provided an alias name and
identifiers.  Prall was subsequently fingerprinted and
released from custody under the alias name he provided.  On
May 19, 2008, the fingerprints left by Prall in Boston were
analyzed against fingerprints on file in the FBI national
fingerprint database for Prall revealing that he was in fact
the same person arrested for drinking in public.  Members of
the U.S. Marshals Service New York/New Jersey Regional
Fugitive Task Force responded to the Boston area to assist
with the fugitive investigation on May 19, 2008.  During the
investigation in Boston, it was learned that Prall had
committed another arson of an apartment building housing
persons with physical and mental disabilities in the
neighboring town of Cambridge, Massachusetts.

5.  On August 2, 2008, Prall, again using an alias, was
identified by local police in Providence, Rhode Island as a
suspect in an assault and robbery occurring there.  Warrants
were subsequently issued for Prall's arrest by Providence
Police on August 2, 2008.

6.  On August 3, 2008, Prall was identified as a suspect
regarding a vehicle theft from North Kingston, Rhode Island.

7.  On August 6, 2008 Prall was identified as a suspect in a
residential burglary which occurred in Morrisville,
Pennsylvania.  An arrest warrant charging Prall with
burglary was subsequently issued by Morrisville Police on
August 6, 2008.  During the burglary in Morrisville,
Pennsylvania, witnesses provided statements identifying
Prall as carrying stolen items from a residence and loading
the items into the vehicle which had been reported stolen
from Rhode Island.  The stolen vehicle was later recovered
unoccupied in Hartford, Connecticut.

(Attachment B to Criminal Complaint, Mag. No. 08-M-1127 (JJH)).

absence in January 2008.  Prall states that Galuchie knowingly used false testimony at this trial to obtain a tainted conviction.  Namely, Alexis Bell testified at trial that she witnessed Prall commit the offenses and then took a restraining order out on him after the incident.  Further, the charging police officers appeared at the trial to coach, counsel and support Bell.  Prall complains that this wrongly conveyed to the jury that Prall was guilty.  (Amended Compl., ¶¶ 42-44).

Prall next alleges that he eventually was apprehended in Connecticut in September 2008.  He waived extradition to New Jersey on the condition that his transport from Connecticut to New Jersey be conducted by the U.S. Marshal.  Prall alleges, however, that defendant Bocchini encouraged Mercer County Sheriff Officers ("MCSOs") to pose as U.S. Marshal officers to effect Prall's extradition.  Prall asserts that when this was done, prosecution of the murder charges became preempted under State v. Morel, 253 N.J. Super. 470 (App. Div. 1992).[2]  (Amended Compl., ¶ 45).

---

[2]  This Court notes that the Morel case does not support Prall's claim against his extradition to New Jersey.  In Morel, the accused had been held in New Jersey under a fugitive warrant originating in New York.  Morel was charged in a New York indictment with serious drug crimes that potentially carried a sentence of life imprisonment, if convicted.  Morel resisted extradition to New York by bringing a habeas proceeding in the Superior Court of New Jersey, Law Division.  The New Jersey court held that Morel was not "bailable" in New Jersey because the offenses for which he was charged in New York were punishable there by life imprisonment.  Morel, 253 N.J. Super. At 472.

Prall reiterates in his Amended Complaint that he was placed in the MCCC on October 22, 2008 upon his extradition to New Jersey.  He states that defendants Ellis and Oliver placed Prall in administrative protective custody, and during his time there, Prall initiated several state court actions and helped other inmates in similar state court proceedings.  In one of his state court actions, Prall states that defendants Bocchini and Blaney moved to dismiss the complaint for failure to state a claim, arguing that Prall had been properly extradited.  While the motion to dismiss was pending, on September 22, 2009, Prall was committed to the AKFC for a 30-day competency evaluation. (Amended Compl., ¶¶ 46, 47).

Prall admits that he refused to cooperate with any of the psychological testing at the AKFC, although he did explain to defendants Roth, Gooriah, Lydia and the John Moe unit manager and nurse defendants at AKFC, that he held deep and sincere beliefs as a conscientious objector to the state's criminal justice system, which Prall contends are conducted in an "oppressive, abusive, egregious and irrational manner."  Prall complains that, because his position "did[ not] fit the diagnostic conclusion that the treatment team wanted to reach, the team disrespected, talked down, and attempted to intimidate Prall with insults and accusations, during rounds on the unit, and at in-camera interviews."  (Amended Compl., ¶¶ 48, 49).

Prall further alleges that the team acted to distort the competency evaluation process, and treated Prall as a nuisance and trouble-maker for the entire time that he was confined there. They denied Prall access to rehabilitation programs for more than a week until a civil rights group allegedly got involved.  When Prall refused to acquiesce, he was denied all the accommodations, advantages and privileges in AKFC and was kept in the locked ward where his cell was constantly flooded with feces and urine and where he was subjected to noise throughout the night, which prevented him from sleeping.  (Amended Compl., ¶¶ 50-52).

Prall alleges that the AKFC team told him that none of the conversations or interaction he had with the team members were recorded, and that whatever opinion the team wrote would be accepted by the courts.  Prall was discharged from AKFC on October 8, 2009.  (Amended Compl., ¶ 53).

Prall next alleges that when he was returned to the MCCC, defendants Ellis and Oliver started to question and investigate the inmates who Prall had helped with their state court actions. Prall alleges that these inmates were threatened with transfers and disciplinary actions if they continued to allow Prall to help them.  (Id., ¶ 54).  When Prall's state court case, Prall v. Burlington County Times, was dismissed, Prall had his other case, Prall v. McDonalds, et al., Docket No. BUR-L-2840-09, served on numerous state and county officials.  Shortly thereafter, Prall alleges that defendants Bocchini, Sypek, Ellis, Hughes, Ganges,

Mair, Blaney, Crowley and Oliver had defendants McCall, Williams, Wilkie and John Doe Mercer County Corrections Officer defendants "stage a pretextual disturbance for Prall to be attacked." Prall states that he was placed in a choke hold and his arms and wrists were twisted to the point that it felt like his bones were going to break. (Id., ¶ 55, 56).

Prall was taken to the infirmary, but he alleges that defendant Nurse Pete discharged Prall without giving him any treatment for severe muscle pain and a loud ringing in his ear. Prall states that he suffered these symptoms for three weeks. Prall further alleges that, on December 13, 2009, false disciplinary charges were issued and that defendant Morris imposed sanctions to cover up the incident. Prall states that he can remember defendants Williams, Wilkie, Pete and Morris say that: "You can sue us all you want. You are in prison and have no rights. The community is against you and believes that you killed your brother. What makes you think that we are going to show any love." (Id., ¶ 57).

In late January 2010, Prall states that he obtained a copy of the October 21, 2008 transcript of his Connecticut state court proceeding in which the state judge directed Prall's extradition. Prall then moved to vacate the dismissal of his state court case, Prall v. Burlington County Times, et al., Docket No. BUR-L-1889-09. He contends that as soon as it was learned that Prall had a

11

copy of the transcript, defendants[3] devised a plan to "separat[e] Prall away from his legal paperwork."  (Id., ¶ 59).

On February 5, 2010, Prall was ordered to appear in state court for sentencing before the Honorable Edward Neafsey, J.S.C. Prall states that Judge Neafsey had a copy of Prall's presentence report, which noted Prall's conscientious objection to state criminal prosecution.  Prall states that the judge ignored Prall's sincerely held belief as well as Prall's contentions that his competency evaluation was a sham and that the prosecutors practiced deception at Prall's trial.  Instead, Prall admits that Judge Neafsey told Prall that the issue of Prall's conscientious objection was for the appellate court to decide at that point since Prall already had been convicted.  (Id., ¶ 61).

Prall next alleges that, within hours of his sentencing, defendants Hughes, Mair, Ganges, Sypek, Blaney, Crowley, Ellis, Oliver and Bocchini ordered that Prall be transferred to the NJSP's MCU.  Prall was not permitted to travel with his legal documents and his documents were not forwarded to NJSP.  Prall reiterates his allegations from the initial Complaint, stating that he was placed on close/camera watch for three weeks with only a filthy gown and dirty mattress on the floor covered with blood and feces.  Prall further alleges that when he covered the

---

[3]  Prall makes a general reference to defendants with respect to his allegations that "defendants" devised a plan to separate Prall from his legal work.  The Court assumes that Prall may be referencing the Mercer County defendants, but the pleading is unclear.

camera in his cell, defendants Ricci, Moliens, Holmes, Barnes, Drumm, Wagner, Keil, Ortiz and Alaimo ordered defendants Newsom and other unknown corrections officers to mace Prall and use a blackjacks, boots and fists to beat him.  (Id., ¶¶ 62, 63).

Thereafter, Prall was placed in a regular cell in the MCU, where he suffers "extreme isolation."  Prall complains that "[a]lmost every aspect of [his] life is controlled and monitored. Opportunities for visitation are rare and always conducted through glass windows.  Prall is deprived of almost any environmental or sensory stimuli and of almost all human contact."  (Id., ¶ 64).  Prall says that placement in MCU is indefinite and inmates lose their eligibility for parole while confined in the MCU.  He is allowed 10 minutes for a shower per day, exercise once per week in a small outside gate.  He alleges in broad fashion that prisoners are "tortured, beaten, harassed, and otherwise mistreated by correction officers, on the regular, in close custody areas that make up the MCU building."  (Id., ¶ 65).

Prall also alleges that, before his March 22, 2010 initial management control unit review committee ("MCURC") placement hearing, defendants Moleins and Holmes told Prall that he was in the MCU because Prall had threatened high ranking government officials.  Prall further contends that the MCURC, which consists of defendants, Ricci, Moleins, Holmes, Barnes, Drumm, Alaimo, Raupp, Ishmael, Stephens and DeFilippo, told him that during his

earlier incarceration and his present confinement, Prall had demonstrated that he is unwilling or unable to be housed with the general prison population and follow prison rules and regulations.  (<u>Id</u>., ¶ 66).

Prall complains that the MCURC intentionally chose not to mention in its review that there were no rehabilitative, treatment or work programs for Prall.  Prall admits that his status as a conscientious objector and the "noncongregate" classification that the MCURC assigned to Prall prevents his ability to comply with work, rehabilitative and treatment programs.  Second, the MCURC noted that Prall demonstrated continued disruption and alienation from the staff and inmate population at the MCCC, which necessitated his placement in administrative protective custody.  However, Prall states that he "got along with inmates well enough to assist them challenging the conditions of their confinement in federal court.  (<u>Id</u>., ¶¶ 67, 68).

Prall also complains that the MCURC falsely insisted that Prall is serving a sentence for escape from the Helene Fuld Medical Center, which resulted in the injuries of two corrections officers, and that Prall threatened the life of former President George W. Bush.  Prall states that the evidence relied upon by the MCURC against Prall is no different from other inmates housed in the New Jersey Department of Corrections ("NJDOC") or the MCCC.  Moreover, Prall complains that Prall's right to contest

his placement in the MCU would require him to explain the nature of the pending charges against him, his possible defenses and infer that Prall has knowledge of incriminating evidence.  (<u>Id</u>., ¶¶ 69, 70, 71).

Prall further complains that the MCURC's decision is based on the fact that Judge Neafsey had to order that Prall be forcibly brought to court for sentencing, when Prall declined to attend due to his conscientious objection to the State's criminal prosecution.  Consequently, he is being punished for his genuinely held beliefs.  (<u>Id</u>., ¶ 72).

Prall also objects to the MCURC's mental health report, dated February 24, 2010, which found that Prall can sustain placement in the MCU.  Prall states that the report is "unreliable junk science conveniently tailored to place Prall in a mold into which he does not fit."  Thus, Prall's assignment to the MCU places him in a state of panic disorder, continuing nightmares, extreme anxiety, oppressive conditions, loss of appetite and weight loss, fatigue and boredom.  Prall alleges that defendant DeFilippo knew "she was being a manipulator when she declared the psychological/emotional pain that Prall is suffering, does not exist."  (<u>Id</u>., ¶ 73).

Prall alleges that the MCURC's decision to keep him confined in the MCU is driven by his history of six (6) disciplinary charges at the MCCC on December 15, 2009, and 26 institutional infractions that resulted in 24 institutional transfers during

15

his prior NJDOC incarceration.  He complains that disciplinary hearing officers ("DHO") and adjustment committees are closely connected to prison security and consequently, make arbitrary and predetermined results in prison disciplinary hearings.  Thus, it is difficult or impossible for Prall to contest his MCU placement.  Prall further argues that his MCU placement is based on his protected activities (i.e., being a conscientious objector, or exercising his constitutional rights by filing lawsuits), rather than his past alleged institutional disciplinary record or threats to government officials.  (Id., ¶¶ 74, 75).

Prall alleges that he is subjected to torture at least once a week, namely, by a choke hold until Prall loses consciousness. He alleges that defendant Newsom and unknown named corrections officers slap his face, stomp on his toes and fingers, spray mace in his eyes, up his nose, down his throat, and on his genitals and rectal area.  These defendants also poke Prall with needles, kick him with boots, punch his body with fists, electrocute Prall with devices that burn holes in the rug and rupture the speakers in a television.  Prall also states that these defendants conduct non-routine body searches in a homosexual manner.  These defendants threaten Prall and tell him they will "man-handle" him and "sodomize" Prall with sticks.  (Id., ¶ 76).

Prall further complains that defendants refuse to process his grievances about the conditions of his confinement or his

appeals of the MCURC's decisions until Prall renounces his beliefs.  Prall states that the "egregious and flagrant" conditions in the MCURC are part of a pattern or practice of the entire staff population covering up for its officers.  He alleges that the wrongful acts by Newsom and other unknown named corrections officers are condoned by defendants Ricci, Moleins, Holmes, Barnes, Drumm, Wagner, Keil, Ortiz, Alaimo and unknown SID investigators.  (Id., ¶¶ 77, 78).

In Counts One and Two of his Amended Complaint, Prall asserts that his First, Eighth and Fourteenth Amendment rights are being violated by defendants, as well as 42 U.S.C. § 2000cc-1(a)(1-3), by penalizing Prall with higher security classification, seizure of property, physical abuse, unequal treatment and adverse retaliatory actions to pressure Prall to modify his behavior and violate his sincerely held beliefs.  He also contends that these actions are committed to inhibit Prall from exercising his right of access to the courts.  (Amended Compl., p. 20).

In Count Three, Prall appears to assert that the AKFC psychological evaluation report issued by the actions of defendants Roth, Gooriah, Lydia, Unit Manager and nurses, also "offend[s] free exercise, establishment, substantive due process, and equal protection clauses, because they unconstitutionally discriminate against objectors, dissenters, and men like Prall,

who have a moral compulsion that makes them incompetent.  <u>See</u>
<u>Larson v. Valenta</u>, 456 U.S. 228 (1982).  (<u>Id</u>., p. 21).

In Count Four, Prall contends that the actions of defendants
violate his "basic and essential fundamental 9th Amendment right
to revolution."  In Count Five, Prall asserts that the New Jersey
state regulations are arbitrary, capricious and unreasonable and
interfere with his First, Fifth (not to incriminate himself),
Sixth (presumption of innocence) and Fourteenth Amendment rights.
Finally, in Count Six, Prall alleges that the defendants are
involved in a civil conspiracy to deprive Prall of his
constitutional rights.  (<u>Id</u>., pp. 21, 22).

Prall seeks declaratory and injunctive relief, as well as
monetary and punitive damages in excess $100,000.00 from each
named defendant.  (Amended Compl., pp. 22-23).

On or about February 24, 2011, Prall filed a motion for a
preliminary and permanent injunction.  (Docket entry no. 18).  In
his motion, Prall states that he is seeking 40 findings of relief
as follows.

First, he claims that he is confronted with choosing between
his religious beliefs, which rejects his participation in the
state court criminal trial proceedings against him, and
challenging state criminal charges against him.  Second, Prall
states that his dilemma "impair[s] his mental and emotional
capacity to participate in adequate presentation of a criminal
defense."  (Docket entry no. 18 at ¶¶ 1 and 2).

18

Third, Prall states that his dilemma in his making a choice as to the "lesser of two evils" resulted in his decision to be absent from his January 2008 state court criminal trial.  Fourth, this choice "does not reveal a voluntary and unjustified absence from his January 2008 trial."  (Id., ¶¶ 3, 4).

Fifth, Prall states that because the New Jersey Department of Corrections ("NJDOC") and the New Jersey Department of Human Services ("NJDHS") receive funding under the "Omnibus Crime Control and Safe Street Act of 1968", the State of New Jersey and the named defendants cannot "escape the strictures of or requirements in 42 U.S.C. § 2000d-4a."  (Id., ¶ 5).

Sixth, Prall states that his strategy to resist state governmental policy or practices that he deems unjust or discriminatory dates back to Jesus' "Sermon on the Mount," and his religious beliefs that compelled him to absent himself from state prosecution should be accorded the broad protection of free religious exercise as guaranteed under the Constitution and 42 U.S.C. § 2000cc.  Seventh, Prall contends that his right to be tried only while competent outweighs the state's compelling interest in the efficient operation of its criminal justice system.  (Id., ¶¶ 6, 7).

Eighth, Prall's conscientious opposition to participating in the state's criminal justice proceedings is a "fundamental aspect of and absolutely necessary to the exercise, teaching, and observance of Plaintiff's Nation of Gods and Earth's System of

Beliefs."  He cites to <u>Marria v. Broaddus</u>, 200 F. Supp.2d 280
(S.D.N.Y. 2002) and <u>Marria v. Broaddus</u>, 2003 WL 21782633
(S.D.N.Y. 2003).[4]  (<u>Id</u>., ¶ 8).

Ninth, Prall states that a substantial burden is created by
pressuring him to renounce his religious beliefs and act in a way
that violates his belief.  Tenth, Prall states that the State and
the defendants resorted to a more restrictive means of compulsory
participation in the criminal trial procedure, requiring Prall to
show he is mentally incompetent to proceed instead of showing his
"moral compulsion that explicitly inhibits [his] action."
(Docket entry no. 18, ¶¶ 9, 10).

Prall continues to argue that, since the State prohibits the
criminal trial of any person who lacks the capacity to assist in

_____

[4]  The Court notes that Prall's reference to these cases
provides background to his purported religious beliefs.  Namely,
Prall is referring to the Nation of Gods and Earths ("Nation")
also referred to as the "Five Percenters," the "Five Percent,"
and the "Five Percent Nation."  The Nation is "a group of
individuals who share a common way of life and culture predicated
on a belief in God."  <u>Marria v. Broaddus</u>, 200 F. Supp.2d at 283.
The Nation was founded more than thirty years ago by Clarence 13X
Smith, who left the Nation of Islam.  The doctrine of Nation
members is based upon the teachings of the Koran and the Bible,
as well as the 120 Degrees, the Supreme Alphabet, and the Supreme
Mathematics.  Nation members generally assert that to engage in
violent or disruptive activities within the state criminal
justice system goes against the teachings of the Nation, which
focus largely on education, self-improvement, self-worth, and
responsibility.  <u>Id</u>.  The Nation "shares some tenets with the
Nation of Islam, including the beliefs that the white man is the
devil and that the white man was made through a selective
breeding process called grafting," but unlike the Nation of
Islam, the Nation teaches that every black man is God, and does
not participate in Ramadan, Jumma, and some other traditional
Islamic customs.  <u>Id</u>., at 284, fn 3.

his or her defense, the State (and the defendants) "cannot treat a moral compulsion on less than equal terms with psychiatric incapacity." (Id., ¶ 11).  Further, Prall contends that the State and defendants are "unable to show a compelling reason to exclude Plaintiff's moral compulsion from protection" that state law purports to protect, "or why they cannot meet the policy objectives in those statutes through nondiscriminatory means. (Id., ¶ 12).

Next, Prall argues that defendants cannot deny the benefits of state law, namely, N.J.S.A. 2C:4-4.d(2)(g) and 2C:4-6 et seq., because of conduct mandated by religion to force Prall to modify his behavior.  Prall also states that the procedures used for a competency evaluation are "much the same as if the prosecution had manipulated material evidence," and that "the psychiatrists, psychologists and other behavioral experts at the sate psychiatric hospitals have no expertise in the area of determining at which point a dissenter's or objector's rights of religious freedom are infringed by the state."  Further, "the evaluations and studies of these mental health professionals have the primary effect or purpose of unduly entangling ill-equipped secular experts into plaintiff's religion."  (Id., ¶¶ 13, 14).

Prall further contends that if a psychiatric patient had ideas identical to Plaintiff's religious convictions against participation in the state's criminal trial proceedings, the defendants "would not say that the patient was fit to proceed."

Prall states that a mental illness that renders a person unable to assist in his criminal defense is so "esoteric that a fact finder of common judgment and experience cannot form a valid judgment without expert testimony."  Thus, Prall argues that it is not within the expertise of the psychiatric and other behavioral experts to "dictate whether plaintiff correctly perceives his religious evaluation and rejection of the participants in the state's criminal trial court proceedings." (Id., ¶¶ 15, 16).

Prall also states that he has the right to have "his mind shaped by his own will and conscience, rather than forced by the state and its agents to adhere to or to affirmatively acknowledge beliefs or views with which he does not agree," and that it is "not for this Court, the defendants or any other state actor to say the line [Prall] drew was an unreasonable one."  (Id., ¶ 17).

Prall states that Judge Neafsey's February 3, 2010 Order directing that he be transported to state court for sentencing by any means necessary, including reasonable force, demonstrates the intensity of his religious belief and objection to participants in the state criminal trial proceedings.  He notes that the New Jersey Deputy Attorney General Matthew Sapienza declined to file a brief or participate in Prall's appeal before the United States Court of Appeals for the Third Circuit.[5]  (Id., ¶ 18).

---

[5]  The Court notes that Mr. Sapienza's letter merely stated that the State of New Jersey, its agencies, officials and employees named in the civil litigation, would not enter an

Prall next states that his conscience would give him no rest or peace if he participates in the state criminal trial proceedings.  He is now confined in the MCU at NJSP because of his refusal for religious reasons to make an appearance in his state court criminal proceedings.  Prall also claims that he was placed in the MCU for helping other inmates file civil actions challenging the conditions of their confinement at the Mercer County Correction Center and for using the state civil courts to expose that three Mercer County Sheriff Officers posed as U.S Marshals in the Superior Court of Connecticut to effect Prall's October 21, 2008 extradition to New Jersey.  (Id., ¶¶ 19, 20).

Prall contends that N.J.A.C. 10A:5-2.4, 10A:5-2.6 and 10A:5-2.7 violate his privilege against self-incrimination and negates the presumption of innocence and is an arbitrary process.  He further argues that his stay at the AKFC from September 1, 2010 to October 17, 2010 discredits the MCURC's finding that Plaintiff poses a threat to the safety and security of any correctional facility because Prall had mingled with other patients and staff every day during his stay at AKFC without incident.  (Id., ¶¶ 21, 22).

---

appearance on Prall's appeal as the State had not participated in the proceedings below (because the case had been dismissed by this Court sua sponte on an in forma pauperis review before service of process) and thus, was unaware of the action until the Clerk of the Court for the Third Circuit informed the New Jersey Attorney General's Office of the matter.

Prall states that he is virtually confined to his cell in the MCU for 24 hours a day, except for a ten minute daily shower and an isolated yard recreational time once every two or three weeks. He has almost no human contact or environmental or sensory stimuli, no job or programs, restrictive visitation, and deprivation of other privileges ordinarily afforded the general prison population.  Prall claims that he is being subjected to torture, cruel, degrading and inhumane treatment and punishment as a means of forcing him to renounce his religious objection to participation in the state criminal trial proceedings.  (Id., ¶ 23).

Prall disputes the need to have placed him in a dry cell for his first three weeks in MCU.  Such dry cell confinement is only done when an inmate damages or destroys plumbing fixtures or floods his cell, and Prall did not commit such acts.  (Id., ¶24).

Prall further states that the MCU is divided into three phases or steps: Phase 1 is non-congregate status; Phase 2 is congregate status and Phase 3 is extended congregate status. Phase 1 is not to exceed 90 days unless there are negative disciplinary infractions.  Prall was placed in the MCU on February 5, 2010 and has not had any disciplinary infractions during this time.  However, the MCURC have refused to move plaintiff from Phase 1 to Phase 2 or 3.  (Id., ¶ 25).

Prall states that the MCURC mental health reports prepared by defendant DeFilippo have maliciously suppressed the fact that

24

the conditions in the MCU have cause Prall to suffer from panic disorder, extreme anxiety, continuing nightmares, obsessive recollection of the oppressive confinement, weight loss, loss of appetite, fatigue, irritability, and episodes of boredom.  Prall further contends that the methodology used by the MCURC mental health reports to rule out severe psychological and emotional symptoms, such as plaintiff alleges he suffers, is not reliable. (Id., ¶¶ 26, 27).

Since Prall was placed in the MCU, he has received only one pair of clothing instead of the required three pairs of state issued clothing typically received by other inmates.  (Id., ¶ 28).

Prall complains that the members of the MCURC are not skilled "in the science of the law nor familiar with the rules of evidence," making them incapable of determining (a) whether the detainers plaintiff has pending are good or bad; (b) whether plaintiff was convicted upon inadmissible evidence; (c) and (d) whether plaintiff's criminal conviction was obtained by depriving plaintiff of due process; (e) and (f) whether N.J.A.C. 10A:5-2.4, 2.6 and 2.7 and N.J.S.A. 2C:4-4.2(2)(g) and 2C:4-6 violate the presumption of innocence and privilege against self-incrimination and fail to consider a religious exception; (g) how and why prosecution for murder is or is not preempted under State v. Morel, 253 N.J. Super. 470 (App. Div. 1992); (h) plaintiff's rights to prepare his defenses in the detainers pending against

him; and (i) plaintiff's inherent right to revolution as set forth in the Declaration of Independence.  (Id., ¶ 29).

Prall contends that, given the infirmities listed above, the Court should find that the MCURC "appl[ies] their own prejudices as substitutes for reasonable prison practices."  Prall further complains that neither the MCU nor MCCC have work, rehabilitative or treatment programs for Plaintiff to perform, and if the MCU does have any such programs, Prall is precluded from participation based on his classification as a non-congregate status in MCU.  Moreover, the conditions in the MCU are not conducive to rehabilitation and treatment and impose a hardship on plaintiff.  Referring to Doggett v. United States, 505 U.S. 647, 655-67 (1992), Prall also contends that the oppressive conditions in the MCU are the "kind of evils that the trial clause was designed to prevent".  (Id., ¶¶ 30-32).

Prall next states that "just because disciplinary hearing officers and adjustment committees found plaintiff guilty of (26) institutional infractions resulting in (24) institutional transfers that the management control review committee relies on, does not mean that plaintiff wasn't framed or that prejudice or corruption did not arbitrarily determine the disciplinary results."  (Id., ¶ 33).

Prall states that he is in a better position than the courts to "see, feel, hear and know about the years of institutionalized misconduct."  (Id., ¶ 34).  Prall reiterates his natural and

inherent right to revolution to reject tyranny and oppression as written by Thomas Jefferson in the Declaration of Independence. (<u>Id</u>., ¶ 35).

Prall states that his motion supports a declaration that defendants have substantially burdened his exercise of religious beliefs and have violated his privilege against self-incrimination and his right to the presumption of innocence, and that defendants also have deprived Prall of food, clothing, exercise and reasonable safety.  Prall seeks a declaration that he has been deprived of due process in violation of <u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974), that he has been singled out for disparate treatment from others "based on the classification whim of defendants," and that he has been penalized for exercising his rights and helping other s exercise rights of access to the courts.  (<u>Id</u>., ¶ 36(a)-(f)).

Prall seeks a declaration that he has a right to revolution under the Ninth and Fourteenth Amendments.  He also seeks a retroactive and prospective injunction enjoining the enforcement of Plaintiff's moral compulsion being excluded from protection under <u>N.J.S.A.</u> 2C:4-4.2(2)(g) and 2C:4-6 <u>et</u> <u>seq</u>., as well as enjoining the enforcement of <u>N.J.A.C.</u> 10A:5-2.4, 2.6 and 2.7. (<u>Id</u>., ¶¶ 37-39).

Prall seeks (a) his immediate release from the MCU, (b) a transfer into the custody of the New Jersey Department of Human Services (NJDHS) for treatment of his moral compulsion on equal

terms with psychiatric incapacity, (c) the ability to travel with his legal documents when transported to the custody of the NJDHS; (d) notification to the state judges and lawyers to change their policy and practice concerning Plaintiff's exercise of his religious beliefs by allowing Plaintiff to exercise his moral compulsion; and (e) notification to the state judges to preempt Plaintiff's state court conviction. (Id., ¶ 40(a)-(e)).

Prall attached a 45-page memorandum in support of his motion. (Docket entry no. 18-2). He describes his religious beliefs and states that based on his beliefs, a civil action challenging his criminal conviction is a more civilized and intelligent discourse than participation in the violent, oppressive and tyrannical state criminal justice system. (Id., pp. 2-5). Prall next states that he was placed in the MCU for three reasons. First, he was placed in the MCU because he refused to participate in his state criminal trial proceeding for religious reasons. Second, he was transferred from the Mercer County Correction center to the MCU at New Jersey State Prison to prevent him from helping other inmates in their litigation against state officials. Third, Prall contends that his transfer from MCCC to the MCU at NJSP was retaliatory after defendants learned that Prall had obtained the October 21, 2008 transcript of the extradition proceeding in the Connecticut state court. Prall states that he was not permitted to travel with his legal documents upon his transfer and that his legal documents were not

28

delivered to him after he was transferred to the MCU.  (Id., pp. 8-11).

Prall reiterates his claims that N.J.A.C. 10A:5-2.4, 2.6 and 2.7 are invalid, that the MCURC's decision to keep Prall in the MCU violates Prall's privilege against self-incrimination and his right to a presumption of innocence with respect to his "attempted escape from a hospital, threatening to kill a retired state judge and former president, and absconding from parole, even though [he] has never been convicted."  (Id., pp. 10-13).

Prall alleges that prison officials make false disciplinary charges against him in order to get Prall out of their housing unit because Prall has time-consuming lawsuits and excessive complaints and does not act in a submissive manner.  He claims that when the correctional officers attack him, they falsify the reports to show justification for the use of force against Prall. If the attack occurred in an area where there is a security camera, the SID tapes over or destroys the video tape.  Prall complains that he has been denied an earlier parole eligibility date because of the false disciplinary charges; that the disciplinary hearing officers are biased against him; that his administrative appeals are denied without meaningful review; and that state court review of the disciplinary findings is futile because the courts likewise rubber stamp the disciplinary finding.  (Id., pp. 13-18).

Prall states that from October 2006 to May 2007, he was confined at MCCC and received recreation outside of his cell and/or in the "dorm" everyday.  When he was returned to MCCC in the administrative protective custody unit in October 2008 and up until December 12, 2009, Prall received on-tier recreation almost everyday, although he did not have yard/outside recreation. During these recreation times, Prall would freely mingle with other inmates and the one corrections officer assigned to the unit without incident.  On December 13, 2009, plaintiff received a total of six disciplinary infractions for which he received 30 days disciplinary detention.  After completing the 30 days detention, Prall was allowed to receive recreation on the tier as usual.  Prall states that from the entire time he was at MCCC, from October 2008 to February 4, 2010, defendants Ellis and Oliver did not place Prall on camera watch.  However, Prall alleges that, upon his retaliatory transfer to NJSP in the MCU, defendants had him placed on camera watch.  Prall states that the MCURC has placed him in the MCU to prevent him from assaulting officers, but if Prall was such a threat, he never would have been allowed to mingle freely in the administrative protective custody unit at MCCC.  (Id., pp. 18-22).

Prall contends that other inmates typically enter the general prison population, and he also should have been allowed to enter the general prison population, but instead, Prall was assigned to the MCU because "being outspoken leads to

retaliation, revenge, and higher security classification."  (Id.,
pp. 23-24).

Prall next alleges that defendants Moliens and Holmes told
him he was placed in the MCU for threatening high ranking
government officials, and that his continued placement is due to
Prall's lack of respect for authority.  However, Prall argues
that the recent arrest of Moliens, Newsom and Alaimo proves that
they are the ones who pose a threat and not plaintiff.  (Id., pp.
24-25).

Prall refers to two other inmates who had been assigned to
the MCU.  One had been at the MCU for seven years after the
federal prison authorities transferred him to the NJSP.  The
inmate was deemed a security threat by the MCURC, but was
eventually returned to a federal facility.  The other inmate also
was deemed a security threat but was later placed in the general
prison population at NJSP, but Prall was not.  (Id., pp. 26-28).

Prall contends that only those inmates demonstrating the
worst behavioral management problems should be confined in the
MCU.  For more than 45 days, from September 1, 2010 to October
17, 2010, Prall was sent to the AKFC for a competency evaluation.
During this time, Plaintiff was permitted to engage in gym,
library, education, workshop and rehabilitative programs,
mingling with other patients and staff, without incident.  It
would appear that Prall is arguing that this shows that he does

31

not pose a security threat as determined by the MCURC, and that
he should be released from the MCU.  (Id., pp. 29-31).

In the remaining pages of Prall's memorandum in support of a
preliminary injunction, Prall argues against his state court
conviction and his extradition to New Jersey, alleging that the
system, from the jury, prosecutors and state court judges are
either incompetent, biased or corrupt, and have deprived
plaintiff of his constitutional rights and his religious
objection to the state criminal trial process.  (Id., pp. 31-42).

## II.  STANDARDS FOR A SUA SPONTE DISMISSAL

The Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-
134, §§ 801-810, 110 Stat. 1321-66 to 1321-77 (April 26, 1996),
requires a district court to review a complaint in a civil action
in which a prisoner is proceeding in forma pauperis or seeks
redress against a governmental employee or entity.  The Court is
required to identify cognizable claims and to sua sponte dismiss
any claim that is frivolous, malicious, fails to state a claim
upon which relief may be granted, or seeks monetary relief from a
defendant who is immune from such relief.  28 U.S.C. §§
1915(e)(2)(B) and 1915A.  This action is subject to sua sponte
screening for dismissal under both 28 U.S.C. § 1915(e)(2)(B) an
§ 1915A.

In determining the sufficiency of a pro se complaint, the
Court must be mindful to construe it liberally in favor of the
plaintiff.  See Erickson v. Pardus, 551 U.S. 89, 93-94

(2007)(following Estelle v. Gamble, 429 U.S. 97, 106 (1976) and Haines v. Kerner, 404 U.S. 519, 520-21 (1972)).  See also United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992).  The Court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff."  Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).  The Court need not, however, credit a pro se plaintiff's "bald assertions" or "legal conclusions."  Id.

A complaint is frivolous if it "lacks an arguable basis either in law or in fact."  Neitzke v. Williams, 490 U.S. 319, 325 (1989) (interpreting the predecessor of § 1915(e)(2), the former § 1915(d)).  The standard for evaluating whether a complaint is "frivolous" is an objective one.  Deutsch v. United States, 67 F.3d 1080, 1086-87 (3d Cir. 1995).

A pro se complaint may be dismissed for failure to state a claim only if it appears "'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Haines, 404 U.S. at 521 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  See also Erickson, 551 U.S. at 93-94 (In a pro se prisoner civil rights complaint, the Court reviewed whether the complaint complied with the pleading requirements of Rule 8(a)(2)).

However, recently, the Supreme Court revised this standard for summary dismissal of a Complaint that fails to state a claim

in <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937 (2009).  The issue before
the Supreme Court was whether Iqbal's civil rights complaint
adequately alleged defendants' personal involvement in
discriminatory decisions regarding Iqbal's treatment during
detention at the Metropolitan Detention Center which, if true,
violated his constitutional rights.  <u>Id</u>.  The Court examined Rule
8(a)(2) of the Federal Rules of Civil Procedure which provides
that a complaint must contain "a short and plain statement of the
claim showing that the pleader is entitled to relief."
<u>Fed.R.Civ.P.</u> 8(a)(2).[6]  Citing its recent opinion in <u>Bell</u>
<u>Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), for the
proposition that "[a] pleading that offers 'labels and
conclusions' or 'a formulaic recitation of the elements of a
cause of action will not do,' "<u>Iqbal</u>, 129 S.Ct. at 1949 (quoting
<u>Twombly</u>, 550 U.S. at 555), the Supreme Court identified two
working principles underlying the failure to state a claim
standard:

> First, the tenet that a court must accept as true all of the
> allegations contained in a complaint is inapplicable to
> legal conclusions.  Threadbare recitals of the elements of a
> cause of action, supported by mere conclusory statements, do
> not suffice ... .  Rule 8 ... does not unlock the doors of
> discovery for a plaintiff armed with nothing more than
> conclusions.  Second, only a complaint that states a
> plausible claim for relief survives a motion to dismiss.
> Determining whether a complaint states a plausible claim for
> relief will ... be a context-specific task that requires the
> reviewing court to draw on its judicial experience and

---

[6]  Rule 8(d)(1) provides that "[e]ach allegation must be
simple, concise, and direct.  No technical form is required."
<u>Fed.R.Civ.P.</u> 8(d).

common sense.  But where the well-pleaded facts do not
permit the court to infer more than the mere possibility of
misconduct, the complaint has alleged-but it has not
"show[n]"-"that the pleader is entitled to relief."  Fed.
Rule Civ. Proc. 8(a)(2).

Iqbal, 129 S.Ct. at 1949-1950 (citations omitted).

The Court further explained that

a court considering a motion to dismiss can choose to begin
by identifying pleadings that, because they are no more than
conclusions, are not entitled to the assumption of truth.
While legal conclusions can provide the framework of a
complaint, they must be supported by factual allegations.
When there are well-pleaded factual allegations, a court
should assume their veracity and then determine whether they
plausibly give rise to an entitlement to relief.

Iqbal, 129 S.Ct. at 1950.

Thus, to prevent a summary dismissal, civil complaints must

now allege "sufficient factual matter" to show that a claim is

facially plausible.  This then "allows the court to draw the

reasonable inference that the defendant is liable for the

misconduct alleged."  Id. at 1948.  The Supreme Court's ruling in

Iqbal emphasizes that a plaintiff must demonstrate that the

allegations of his complaint are plausible.  Id. at 1949-50; see

also Twombly, 505 U.S. at 555, & n.3; Fowler v. UPMC Shadyside,

578 F.3d 203, 210(3d Cir. 2009).

Consequently, the Third Circuit observed that Iqbal provides

the "final nail-in-the-coffin for the 'no set of facts' standard"

set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957),[7] that

---

[7]   In Conley, as stated above, a district court was
permitted to summarily dismiss a complaint for failure to state a
claim only if "it appear[ed] beyond doubt that the plaintiff can
prove no set of facts in support of his claim which would entitle

applied to federal complaints before <u>Twombly</u>.  <u>Fowler</u>, 578 F.3d at 210.  The Third Circuit now requires that a district court must conduct the two-part analysis set forth in <u>Iqbal</u> when presented with a motion to dismiss:

> First, the factual and legal elements of a claim should be separated.  The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [<u>Iqbal</u>, 129 S.Ct. at 1949-50].  Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." [<u>Id.</u>]  In other words, a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to "show" such an entitlement with its facts.  <u>See</u> <u>Phillips</u>, 515 F.3d at 234-35.  As the Supreme Court instructed in <u>Iqbal</u>, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show [n]'-'that the pleader is entitled to relief.'" <u>Iqbal</u>, [129 S.Ct. at 1949-50].  This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Id</u>.

<u>Fowler</u>, 578 F.3d at 210-211.

This Court is mindful, however, that the sufficiency of this <u>pro se</u> pleading must be construed liberally in favor of Plaintiff, even after <u>Iqbal</u>.  <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89 (2007).  Moreover, a court should not dismiss a complaint with prejudice for failure to state a claim without granting leave to amend, unless it finds bad faith, undue delay, prejudice or futility. <u>See</u> <u>Grayson v. Mayview State Hosp.</u>, 293 F.3d 103, 110-

---

him to relief.  <u>Id</u>., 355 U.S. at 45-46.  Under this "no set of facts" standard, a complaint could effectively survive a motion to dismiss so long as it contained a bare recitation of the claim's legal elements.

111 (3d Cir. 2002); <u>Shane v. Fauver</u>, 213 F.3d 113, 117 (3d Cir. 2000).

### III.  <u>SECTION 1983 ACTIONS</u>

Plaintiff brings this action under 42 U.S.C. § 1983.

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... .

Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law.  <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988); <u>Piecknick v. Pennsylvania</u>, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

### IV.  <u>ANALYSIS</u>

A.  <u>Challenges to Prall's State Court Conviction and Extradition</u>

It is evident that Prall is using this civil action to challenge his state court conviction and extradition, as well as other undefined detainers allegedly lodged against him for pending state criminal charges.  The Court observes that Prall was convicted <u>in absentia</u> in the Superior Court of New Jersey, Law Division, Mercer County, in or about November 2007, and that

37

Prall was sentenced on that conviction on or about February 3, 2010.  Thus, it would appear that Prall's present confinement in the NJSP MCU is pursuant to that conviction and sentence. Prall's earlier confinement at MCCC appears to have been based on his state court detainers with respect to other criminal charges, as well as his extradition to New Jersey for sentencing based on his prior conviction in absentia.

Thus, to the extent that Prall is challenging his state court conviction and sentence, and is seeking his release from confinement, his appropriate remedy is by a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  See Preiser v. Rodriguez, 411 U.S. 475 (1973).

In a series of cases beginning with Preiser, the Supreme Court has analyzed the intersection of 42 U.S.C. § 1983 and the federal habeas corpus statute, 28 U.S.C. § 2254.  In Preiser, state prisoners who had been deprived of good-conduct-time credits by the New York State Department of Correctional Services as a result of disciplinary proceedings brought a § 1983 action seeking injunctive relief to compel restoration of the credits, which would have resulted in their immediate release.  411 U.S. at 476.  The prisoners did not seek compensatory damages for the loss of their credits.  411 U.S. at 494.  The Court held that "when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a

speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus."  Id. at 500.

Indeed, here, any § 1983 claim against any of the named defendants based on the contention that Prall's conviction was invalid or erroneously obtained in violation of his constitutional rights also is barred by Heck v. Humphrey, 512 U.S. 477, 487 (1994)(holding that "the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated").

In Heck, the Supreme Court addressed a corollary question to that presented in Preiser, i.e., whether a prisoner could challenge the constitutionality of his conviction in a suit for damages only under § 1983 (a form of relief not available through a habeas corpus proceeding).  The Court rejected § 1983 as a vehicle to challenge the lawfulness of a criminal judgment.

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.  A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

512 U.S. at 486-87 (footnote omitted).  The Court further instructed district courts, in determining whether a complaint states a claim under § 1983, to evaluate whether a favorable outcome would necessarily imply the invalidity of a criminal judgment.

> Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

512 U.S. at 487 (footnotes omitted).

The Court held that "a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated."  Id. at 489-90.

Here, it is plain that Prall's conviction has not yet been invalidated.  Prall admits as much, claiming that his religious beliefs prevent him from participating in the state court criminal justice system.  Indeed, it would appear that Prall has not filed a direct appeal from his conviction and sentence in state court as required before bringing a federal habeas action under § 2254.  See 28 U.S.C. § 2254(b)(1)(a state prisoner applying for a writ of habeas corpus in federal court must first "exhaust[] the remedies available in the courts of the State," unless "there is an absence of available State corrective

process[] or ... circumstances exist that render such process ineffective ... .").  Consequently, any claim in this § 1983 action that would necessarily imply the invalidity of Prall's conviction is plainly barred by Heck.  Therefore, the Complaint and Amended Complaint will be dismissed without prejudice, as to defendants, Bocchini, Sypek, Blair, Hughes, Ganges, Mair, Blaney and Crowley, for failure to state a claim upon which relief may be granted at this time, pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

Similarly, to the extent that Prall is challenging his extradition and his detention pursuant the unidentified state court detainers with respect to pending criminal charges, the Complaint and Amended Complaint must be dismissed.  Federal courts have jurisdiction, under 28 U.S.C. § 2241, to issue a writ of habeas corpus before a judgment is entered in a state criminal proceeding.  Moore v. DeYoung, 515 F.2d 437, 441-42 (3d Cir. 1975).  However, such jurisdiction is limited.  Addressing whether a federal court should ever grant a pre-trial writ of habeas corpus to a state prisoner, the United States Court of Appeals for the Third Circuit has held:

    (1)   federal courts have "pre-trial" habeas corpus jurisdiction;

    (2)   that jurisdiction without exhaustion should not be exercised at the pre-trial stage unless extraordinary circumstances are present ... ;

    (3)   where there are no extraordinary circumstances and where petitioner seeks to litigate the merits of a constitutional defense to a state criminal charge, the district court should exercise its "pre-trial" habeas

41

> jurisdiction only if petitioner makes a special showing
> of the need for such adjudication and has exhausted
> state remedies.

Id. at 443.

Here, Prall has not alleged that he has exhausted his state remedies in this regard. Moreover, Prall fails to allege any "extraordinary circumstances" justifying intervention by a federal court. Rather, he simply asserts a claim that his religious beliefs preclude his participation in state court criminal proceedings. Prall has not described any effort he has made to test the lawfulness of his pre-trial detention and his extradition in the New Jersey state courts since his extradition. Thus, it would appear that Prall simply prefers to test the lawfulness of his pretrial detention in federal court without first presenting his claims for state court review. Given the complete absence of any "exceptional circumstances" that would justify federal intervention in Prall's pending state proceedings, this Court finds that the § 1983 complaint must be dismissed at this time with respect to these claims.

B.   Prosecutorial Immunity

Prall asserts claims against Mercer County prosecutors, namely, Bocchini and Galuchie.[8] Prall alleges that Galuchie

---

[8]   Prall did not name Galuchie in the caption of his complaints, but made specific allegations against Galuchie in the body of his Amended Complaint.

42

knowingly used false testimony at trial to obtain Prall's conviction.[9]

"[A] state prosecuting attorney who act[s] within the scope of his duties in initiating and pursuing a criminal prosecution" is not amenable to suit under § 1983.  Imbler v. Pachtman, 424 U.S. 409, 410 (1976).  Thus, a prosecutor's appearance in court as an advocate in support of an application for a search warrant and the presentation of evidence at such a hearing are protected by absolute immunity.  Burns v. Reed, 500 U.S. 478, 492 (1991).  Similarly, "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity."  Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993).

A prosecutor is not entitled to absolute immunity, however, for actions undertaken in some other function.  See Kalina v. Fletcher, 522 U.S. 118 (1997) (prosecutor is protected only by qualified immunity for attesting to the truth of facts contained in certification in support of arrest warrant, as in her provision of such testimony she functioned as a complaining witness rather than a prosecutorial advocate for the state); Burns, 500 U.S. at 492-96 (the provision of legal advice to police during pretrial investigation is protected only by

_____

[9]  A witness friend had testified that she saw Prall commit the offenses.  The witness also obtained a restraining order against Prall.

43

qualified immunity); <u>Buckley</u>, 409 U.S. at 276-78 (prosecutor is not acting as an advocate, and is not entitled to absolute immunity, when holding a press conference or fabricating evidence).  <u>See</u> <u>also</u> <u>Yarris v. County of Delaware</u>, 465 F.3d 129 (3d Cir. 2006)(where the Court of Appeals for the Third Circuit presents a detailed and nuanced analysis of when a prosecuting attorney is, and is not, entitled to absolute immunity for allegedly wrongful acts in connection with a prosecution, holding, for example, that a prosecutor is not entitled to absolute immunity for deliberately <u>destroying</u> highly exculpatory evidence, but is entitled to immunity for making the decision to deliberately <u>withhold</u> exculpatory evidence before and during trial, but not after the conclusion of adversarial proceedings).

Here, Prall's allegations against Galuchie plainly fall within the scope of her prosecutorial duties in initiating and pursuing a criminal prosecution against plaintiff.  There are no allegations that appear to fall outside the scope of Galuchie's prosecutorial role, and this Court is hard-pressed to find any allegation of wrongdoing or prosecutorial misconduct of any kind. <u>See</u> <u>Imber</u>, 424 U.S. at 424-47 (finding absolute immunity for prosecutor's knowing use of perjured testimony in judicial proceedings).

Similarly, Prall's claims against Mercer County Prosecutor Bocchini will be dismissed.  Prall makes no allegations of wrongdoing outside Bocchini's prosecutorial duties in initiating and pursuing a criminal prosecution against Prall.  Bocchini's

role in the extradition judicial proceedings are protected by absolute immunity.  To the extent that Prall may be alleging a claim of conspiracy by the prosecutor defendants and the other Mercer County Counsel, Administrative and Executive defendants, the Complaint consists of nothing more than threadbare, conclusory statements that fail to satisfy the pleading requirements under Rule 8.  <u>See</u> <u>Iqbal</u>, 129 S.Ct. at 1949-50. Accordingly, the claims against the prosecutor defendants, Bocchini and Galuchie, for their conduct and actions during the investigation, indictment, prosecution and extradition of Prall must be dismissed with prejudice for failure to state a cognizable claim under § 1983.

C.  <u>Supervisor Liability</u>

Prall also asserts general claims against defendants, Arthur R. Sypek, Jr., Mercer County Counsel; Teresa Blair, Attorney General for the State of New Jersey; Brian Hughes, Mercer County Executive; Kelvin S. Ganges, Mercer County Chief of Staff; Andrew A. Mair, Mercer County Administrator; Joseph P. Blaney, Assistant Mercer County Counsel and Sarah G. Crowley, Deputy Mercer County Counsel.  There are no factual allegations of wrongdoing by these individuals, other than a bald claim that they conspired against Prall with respect to his extradition, his incarceration, his sentence and his assignment to the MCU.  At most, several of these Mercer County Counsel defendants responded to interrogatories with respect to state civil actions Prall filed against Mercer County officials.  Thus, it appears that Prall

brings this action against these individuals based on their supervisory positions.

As a general rule, government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of <u>respondeat superior</u>.  <u>See</u> <u>Iqbal</u>, 129 S.Ct. at 1948; <u>Monell v. New York City Dept. Of Social Servs.</u>, 436 U.S. 658, 691 (1978)(finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983); <u>Robertson v. Sichel</u>, 127 U.S. 507, 515-16 (1888)("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of subagents or servants or other persons properly employed by or under him, in discharge of his official duties").  In <u>Iqbal</u>, the Supreme Court held that "[b]ecause vicarious or supervisor liability is inapplicable to <u>Bivens</u>[10] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." <u>Iqbal</u>, 129 S.Ct. at 1948.  Thus, each government official is liable only for his or her own conduct.  The Court rejected the contention that supervisor liability can be imposed where the official had only "knowledge" or "acquiesced" in their subordinates conduct.  <u>Id</u>., 129 S.Ct. at 1949.

Under pre- <u>Iqbal</u> Third Circuit precedent, "[t]here are two theories of supervisory liability," one under which supervisors

[10]   <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971)

can be liable if they "established and maintained a policy, practice or custom which directly caused [the] constitutional harm," and another under which they can be liable if they "participated in violating plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations." Santiago v. Warminster Twp., 629 F.3d 121, 127 n. 5 (3d Cir. 2010)(internal quotation marks omitted).  "Particularly after Iqbal, the connection between the supervisor's directions and the constitutional deprivation must be sufficient to demonstrate a plausible nexus or affirmative link between the directions and the specific deprivation of constitutional rights at issue." Id. at 130.

The Third Circuit has recognized the potential effect that Iqbal might have in altering the standard for supervisory liability in a § 1983 suit but, to date, has declined to decide whether Iqbal requires narrowing of the scope of the test.  See Santiago, 629 F.3d 130 n. 8; Bayer v. Monroe County Children and Youth Servs., 577 F.3d 186, 190 n. 5 (3d Cir. 2009)(stating in light of Iqbal, it is uncertain whether proof of personal knowledge, with nothing more, provides sufficient basis to impose liability upon supervisory official).  Hence, it appears that, under a supervisory theory of liability, and even in light of Iqbal, personal involvement by a defendant remains the touchstone for establishing liability for the violation of a plaintiff's

constitutional right.  <u>Williams v. Lackawanna County Prison</u>, 2010 WL 1491132, at *5 (M.D.Pa. Apr. 13, 2010).

Facts showing personal involvement of the defendant must be asserted; such assertions may be made through allegations of specific facts showing that a defendant expressly directed the deprivation of a plaintiff's constitutional rights or created such policies where the subordinates had no discretion in applying the policies in a fashion other than the one which actually produced the alleged deprivation; <u>e.g.</u>, supervisory liability may attach if the plaintiff asserts facts showing that the supervisor's actions were "the moving force" behind the harm suffered by the plaintiff.  <u>See</u> <u>Sample v. Diecks</u>, 885 F.2d 1099, 1117–18 (3d Cir. 1989); <u>see also</u> <u>Iqbal</u>, 129 S.Ct. at 1949–54.

Here, Prall provides no facts describing how the supervisory defendants allegedly violated his constitutional rights, <u>i.e.</u>, he fails to allege facts to show that these defendants expressly directed the deprivation of his constitutional rights, or that they created policies which left subordinates with no discretion other than to apply them in a fashion which actually produced the alleged deprivation.  In short, Prall has alleged no facts to support personal involvement by the supervisory defendants, and simply relies on recitations of legal conclusions such that they failed to supervise or failed to protect plaintiff in violation of his constitutional rights.  These bare allegations, "because they are no more than conclusions, are not entitled to the assumption of truth." <u>Iqbal</u>, 129 S.Ct. at 1950.  Accordingly,

this Court will dismiss the Complaint and Amended Complaint in their entirety, as against defendants, Sypek, Blair, Hughes, Ganges, Mair, Blaney and Crowley, pursuant to 28 U.S.C. § 1915(e)(2)(B) and § 1915A(b)(1), because Prall has failed to state a viable supervisor liability claim at this time.

D.  Conspiracy Claim

Prall also asserts a general claim that the defendants conspired with each other to retaliate against Plaintiff for asserting his conscientious objection to participation in his state criminal proceedings.  The claim, however, is completely devoid of any factual support.  "[N]aked assertions devoid of further factual enhancement" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" cannot sustain an action.  Iqbal, 129 S.Ct. at 1949. Therefore, this Court must dismiss this bald claim alleging conspiracy, without prejudice, as against all named defendants, pursuant to 28 U.S.C. § 1915(e)(2)(B) and § 1915A(b)(1), for failure to state a claim at this time.

E.   Deprivation of Property Claim

Prall alleges that he was not permitted to take his legal documents with him when he was transferred from MCCC to the MCU at NJSP.  He further states that his legal documents have not been restored to him.  Prall contends that the deprivation of his legal documents was intentional.

To the extent that Prall is raising a deprivation of property claim, it must be dismissed for failure to state a claim.  The Fourteenth Amendment provides, in pertinent part here, that the State may not "deprive any person of life, liberty, or property, without due process of law[.]"  The "due process of law" essentially requires that the government provide a person notice and opportunity to be heard in connection with the deprivation of life, liberty or property.  Zappan v. Pennsylvania Board of Probation and Parole, 152 Fed. Appx. 211, 220 (3d Cir. 2005)("The essential requirements of any procedural due process claim are notice and the opportunity to be heard.").  Hence, to establish a prima facie case of a procedural due process violation, a plaintiff must establish: (1) a deprivation of a constitutionally protected liberty or property interest, (2) state action, and (3) constitutionally inadequate process.  See Rusnak v. Williams, 44 Fed. Appx. 555, 558 (3d Cir. 2002) ("Procedural due process claims, to be valid, must allege state sponsored-deprivation of a protected interest in life, liberty or property.  If such an interest has been or will be deprived, procedural due process requires that the governmental unit

provide the individual with notice and a reasonable opportunity to be heard.")(citation omitted).

To have a property interest, Prall must demonstrate "more than an abstract need or desire for it. ... He must, instead, have a legitimate claim of entitlement to it" under state or federal law.  Board of Regents v. Roth, 408 U.S. 564, 577 (1972). For present purposes, a procedural due process analysis involves a two step inquiry: the first question to be asked is whether the complaining party has a protected liberty or property interest within the contemplation of the Due Process clause of which he has been deprived and, if so, the second question is whether the process afforded the complaining party to deprive him of that interest comported with constitutional requirements.  Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000).

Here, the property at issue is legal documents, in particular, a transcript of the extradition hearing in Connecticut state court.  Prall does not allege that he has been precluded from obtaining another copy of the lost transcript. Further, Prall has not demonstrated that the loss of his legal documents have prevented him from pursuing this action, or any action in state court.

Moreover, Prall has a post-deprivation remedy.  Property loss caused by the intentional acts of government officials does not give rise to a procedural due process claim under § 1983 where a post-deprivation remedy satisfying minimum procedural due process requirements is available under state law.  See Parratt

51

v. Taylor, 451 U.S. 527 (1981) (overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327 (1986)); see also Zinermon v. Burch, 494 U.S. 113, 115 (1990); Hudson v. Palmer, 468 U.S. 517 (1984); Holman, 712 F.2d at 856.[11]  The New Jersey Tort Claims Act ("NJTCA"), N.J. STAT. ANN. § 59:1-1 et seq., provides a post-deprivation judicial remedy to persons who believe they were deprived of property at the hands of the State or local government.  See  Holman, 712 F.2d at 857; Asquith v. Volunteers of America, 1 F. Supp.2d 405, 419 (D.N.J. 1998), aff'd 186 F.3d 407 (3d Cir. 1999).

    Therefore, any deprivation of property claim asserted by Prall here will be dismissed with prejudice for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

F.  Access to Courts Claim

    Prall also appears to assert a claim that he has been denied access to the courts in violation of his First and Fourteenth Amendment rights.  Courts have recognized different constitutional sources for the right of access to the courts. Principally, the right of access derives from the First

---

    [11]  In Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982), the Supreme Court explained, however, that post-deprivation remedies do not satisfy the Due Process Clause if the deprivation of property is accomplished pursuant to established state procedure rather than through random, unauthorized action.  455 U.S. at 435-36.  But see Tillman v. Lebanon Co. Correctional Facility, 221 F.3d 410, 421 n.12 (3d. Cir. 2000)(citing United States v. James Daneil Good Real Property, 510 U.S. 43, 53 (1993))(in "extraordinary situations" such as routine deduction of fees from a prisoner's account even without authorization, post-deprivation remedies may be adequate).

Amendment's right to petition and the due process clauses of the Fifth and Fourteenth Amendments.[12]  The right of access to the courts requires that "adequate, effective, and meaningful" access must be provided inmates who wish to challenge their criminal charge, conviction, or conditions of confinement.  Bounds v. Smith, 430 U.S. 817, 822 (1977).  In other words, prison officials must "give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the Courts." Id. at 825.  "'[T]he touchstone ... is meaningful access to the courts.'" Peterkin v. Jeffes, 855 F.2d 1021, 1037 (3d Cir. 1988)(quoting Bounds, 430 U.S. at 823)(internal quotation omitted).

In Bounds, the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of

---

[12]  The right of access to the courts is an aspect of the First Amendment right to petition. McDonald v. Smith, 472 U.S. 479, 482 (1985); Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 741 (1983); Milhouse v. Carlson, 652 F.2d 371, 373 (3d Cir. 1981).  The Supreme Court also found that "[t]he constitutional guarantee of due process of law has as a corollary the requirement that prisoners be afforded access to the courts in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights." Procunier v. Martinez, 416 U.S. 396, 419 (1974), overruled on other grounds, Thornburgh v. Abbott, 490 U.S. 401, 413-14 (1989). See also, Hudson v. Palmer, 468 U.S. 517, 523 (1984)("prisoners have the constitutional right to petition the Government for redress of their grievances, which includes a reasonable right of access to the courts"); Bounds v. Smith, 430 U.S. 817 (1977); Wolff v. McDonnell, 418 U.S. 539, 576 (1974).  The right of access to the courts might also arise under the Sixth Amendment's right to counsel; however, under the circumstances of the present case, the Sixth Amendment clearly is not implicated.

meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."  The right of access to the courts is not, however, unlimited.  "The tools [that Bounds] requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any <u>other</u> litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration."  <u>Lewis v. Casey</u>, 518 U.S. 343, 355 (1996) (emphasis in original).  Similarly, a pretrial detainee has a right of access to the courts with respect to legal assistance and participation in one's own defense against pending criminal charges.  <u>See</u>, <u>e.g.</u>, <u>May v. Sheahan</u>, 226 F.3d 876, 883-84 (7th Cir. 2000); <u>Caldwell v. Hall</u>, 2000 WL 343229 (E.D. Pa. March 31, 2000).  <u>But see</u> <u>United States v. Byrd</u>, 208 F.3d 592, 593 (7th Cir. 2000) (pretrial detainee who rejects an offer of court-appointed counsel in satisfaction of the Sixth Amendment right to counsel has no alternative right to access to a law library); <u>Wilson v. Blankenship</u>, 163 F.3d 1284, 1290-91 (11th Cir. 1998) (same); <u>United States v. Walker</u>, 129 F.3d 1266, 1997 WL 720385, **4 (6th Cir. 1997) (same).

Moreover, a prisoner alleging a violation of his right of access must show that prison officials caused him past or imminent "actual injury" by hindering his efforts to pursue such a claim or defense.  <u>See</u> <u>Lewis</u>, 518 U.S. at 348-51, 354-55

(1996); Oliver v. Fauver, 118 F.3d 175, 177-78 (3d Cir. 1997). "He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known.  Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable to file even a complaint."  Lewis, 518 U.S. at 351.

Here, Prall fails to allege any actual injury as a result of the alleged denial of access to the courts.  He does not allege that he was unable to file this or any other complaint in the courts, and in fact, he has not been limited in filing the instant action, or his numerous, other state and federal court complaints.  He also does not allege that any of his court cases were dismissed because he did not have timely access to the courts.  At best, he seems to argue that the loss of his legal documents, in particular, his transcript of his extradition proceedings, upon his transfer to the MCU, resulted in the dismissal of his civil lawsuit against Bocchini in state court. This allegation is belied by the facts admitted in Prall's lengthy pleadings in this case.  Namely, the documents attached to Prall's motion for preliminary injunction show that his state court motion for a preliminary injunction was denied and the matter was dismissed in part for failure to state a claim.  In short, Prall fails to articulate how the absence of the

transcript from his extradition proceeding has hindered his efforts to either pursue his state court case or defend himself in any pending state or federal proceedings.  Consequently, the allegations in the Complaint are too conclusory to show a denial of court access sufficient to rise to the level of a constitutional deprivation under the Iqbal pleading standard. "[T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation .... Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." Iqbal, 129 S.Ct. at 1949 (citations and internal quotation marks omitted).  Therefore, Prall's denial of access to the courts claim will be dismissed without prejudice, in its entirety as against all named defendants, for failure to state a claim at this time.

G.   MCU Placement and Classification Claim

It also appears that Prall is asserting that his placement in the MCU and his "non-congregate" classification implicates a deprivation of liberty interest protected by due process.

It is well-established that an inmate does not possess a liberty interest arising from the Due Process Clause in assignment to a particular custody level or security classification or a place of confinement.  See Wilkinson v. Austin, 545 U.S. 209, 221-22 (2005)(the Constitution does not give rise to a liberty interest in avoiding transfers to more adverse conditions of confinement); Olim v. Wakinekona, 461 U.S.

56

238, 245 (1983); Meachum v. Fano, 427 U.S. 215, 224-25 (1976); Moody v. Daggett, 429 U.S. 78, 88 n. 9 (1976). The custody placement or classification of state prisoners within the State prison system is among the "wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." Meachum, 427 U.S. at 225. Governments, however, may confer on inmates liberty interests that are protected by the Due Process Clause. "But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). Thus, a convicted inmate such as Prall has no liberty interest arising by force of the Due Process Clause itself in remaining in the general population. See Hewitt v. Helms, 459 U.S. 460, 466-67 & n. 4 (1983); Montanye, 427 U.S. at 242; Torres v. Fauver, 292 F.3d 141, 150 (3d Cir. 2002).

However, the state may create a protected liberty interest through a statute or regulation requiring placement in the general population under certain circumstances. See Sandin, 515 U.S. at 483-84. "[M]andatory language in a state law or regulation can create a protected liberty interest only if the alleged deprivation 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison

life.'"  Torres, 292 F.3d at 151 (quoting Sandin, 515 U.S. 484).
But "confinement in administrative or punitive segregation will
rarely be sufficient, without more, to establish the kind of
'atypical' deprivation of prison life necessary to implicate a
liberty interest."  Smith v. Mensinger, 293 F.3d 641, 653 (3d
Cir. 2002); see Fraise v. Terhune, 283 F.3d 506, 522-523 (3d Cir.
2002)(New Jersey prisoners have no protected liberty interest in
being free of indefinite segregated confinement in Security
Threat Group Management Unit).  Thus, in general, Prall's
confinement in MCU does not impose an atypical and significant
hardship in relation to the ordinary incidents of prison life in
New Jersey, and Prall has no state created liberty interest in
avoiding such confinement.  See Bowman v. Ricci, No. 07-2610,
2007 WL 2080066, at *2 (D.N.J. July 17, 2007); Lepiscopo v.
Harvey, No. 06-3207, 2006 WL 2403903, at *3 (D.N.J. Aug.18,
2006).

    Nevertheless, at some point Prall's continued placement in
the MCU may implicate such interest, as an inmate may not be
housed in the MCU indefinitely without the prospect of release.
See Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000)(finding that
"eight years in administrative custody, with no prospect of
immediate release in the near future, is 'atypical'" and affected
the plaintiff's liberty interest).  However, even if a lengthy
confinement in a restrictive prison environment amounts to an
"atypical and significant hardship in relation to the ordinary
incidents of prison life," see Shoats, 213 F.3d at 143-44, that

58

finding does not end the inquiry for purposes of procedural due process.[13]  The question then becomes what process a prison setting requires.  Such process must include the prisoner's opportunity to present his views to the prison official charged with deciding whether to retain him in such restrictive environment.  See id. at 145-46 (relying on Hewitt v. Helms, 459 U.S. 460, 476 (1983)).

New Jersey regulations provide for routine reviews every three months and annual reviews of each inmate assigned to the MCU.  N.J.A.C. 10A:5-2.10, 10A:5-2.11.  Prall does not allege that he has been denied routine and annual review hearings provided by state regulation.  Rather, he seems to assert that his placement and classification status in the MCU is related to his conscientious objection to participation in the state criminal justice system.  Prall essentially argues that the MCURC's decisions respecting his continued placement and non-congregate status are a sham.  He contends that the MCURC's reliance on Prall's history of institutional infractions and threats against government officials is a ruse.  Prall points to his past history at MCCC and AKFC, where he was allowed to mingle with other inmates, patients and staff, to show that his non-

---

[13]  The Court recognizes that Prall may be alleging undue hardship given his allegations concerning the conditions of his confinement and his excessive force claim.  However, those claims have been considered separately, and are proceeding in the context of Eighth Amendment violations, as set infra.  In the present claim, the Court is assessing only whether Prall's continued placement and classification status in the MCU violates due process.

congregate status is an artifice contrived by the MCURC to pressure Prall into renouncing his religious beliefs.

This Court finds that Prall has not demonstrated a denial of due process with respect to his MCU placement and classification status.  Prall does not allege that his MCU placement and reviews did not conform to the requirements under N.J.A.C. 10A:5-2.10 and 10A:5-2.11.  Indeed, he does not allege that he was denied an opportunity at any time to be heard and produce evidence and testimony on his behalf at his placement and review hearings.

Moreover, Prall's own admissions tend to show that his continued confinement in the MCU is not based solely on his past criminal and disciplinary history without contemporaneous justification.  Accordingly, this Court finds that Prall's continued placement and classification status in the MCU does not violate due process.  Prall has failed to provide any support, other than supposition and unsubstantiated assumptions, for his contention that the MCURC reviews were perfunctory and constitutionally inadequate.  The Court finds, based on Prall's own admissions, that his placement and classification status in the MCU "comport[s] with the minimum constitutional standards for due process."  Shoats, 213 F.3d at 147.  Therefore, this claim will be dismissed in its entirety as against all named defendants for failure to state a claim at this time.

H.   False Disciplinary Charges

Prall also asserts that false disciplinary charges have been filed against him in violation of his constitutional rights.

60

However, the act of filing false disciplinary charges does not itself violate a prisoner's constitutional rights.  See Freeman v. Rideout, 808 F.2d 949, 952-53 (2d Cir. 1986)(holding that "the mere filing of [a false] charge itself" does not constitute a cognizable claim under § 1983 so long as the inmate "was granted a hearing, and had the opportunity to rebut the unfounded or false charges"), cert. denied, 485 U.S. 982 (1988); Hanrahan v. Lane, 747 F.2d 1137, 1140 (7th Cir. 1984)(finding that so long as prison officials provide a prisoner with the procedural requirements outlined in Wolff v. McDonnell, 418 U.S. 539, 558 (1974),[14] then the prisoner has not suffered a constitutional violation).  See also Creter v. Arvonio, No. 92-4493, 1993 WL 306425, at *7 (D.N.J. Aug. 5, 1993); Duncan v. Neas, No. 86-109, 1988 WL 91571, at *1 (D.N.J. Aug. 30, 1988)(determining that "the alleged knowing falsity of the charge [does not state] a claim of deprivation of a constitutionally protected liberty interest ... where procedural due process protections were provided").

In this case, Prall does not allege that he was denied an institutional disciplinary hearing or an opportunity to present

---

[14]   In Wolff v. McDonnell, the Supreme Court set forth the requirements of due process in prison disciplinary hearings.  An inmate is entitled to (1) written notice of the charges and no less than 24 hours to marshal the facts and prepare a defense for an appearance at the disciplinary hearing; (2) a written statement by the fact finder as to the evidence relied on and the reasons for the disciplinary action; and (3) an opportunity "to call witnesses and present documentary evidence in his defense when to do so will not be unduly hazardous to institutional safety or correctional goals."  Wolff, 418 U.S. at 563-71.  In this case, there are no allegations that Plaintiff was denied these due process requirements.

evidence to refute the charges.  Rather, he merely complains that the disciplinary hearing officers are biased and that their decisions are rubber stamped on administrative appeal. Consequently, there are no factual allegations of wrongdoing that would rise to the level of a constitutional deprivation in order to support a claim of false disciplinary charges, and such claim will be dismissed, as against all named defendants, for failure to state a claim upon which relief may be granted.

I.   Conditions of Confinement Claims

Prall next asserts that he is being subjected to unconstitutional treatment and conditions of confinement at the MCU in violation of his rights under the Eighth Amendment. First, Prall alleges that, when he was first placed in the MCU, he was put under camera watch for three weeks and given only a gown and a mattress on the floor in his cell during this time. He states that the floor and walls in his cell were filthy, covered in blood and feces.  He had complained about the conditions and that his skin was itching from not taking showers. No remedy was provided.

After the three weeks expired, Prall was placed in a regular cell in the MCU.  He states that he was not given a blanket, sheets, slippers, shoes, "draws", towels, wash rag, hygiene supplies, exercise or emergency canteen.  Prall does admit that he received "one pair" of clothing (instead of the usual three), is allowed a 10 minute shower each day and isolated yard recreation/exercise outside his cell once per week.  However, he

further complains that his MCU placement has caused him to suffer "extreme isolation."  Visitation is rare and restricted to glass window with no contact allowed.  Prall claims that he is deprived of "almost any environmental or sensory stimuli and of almost all human contact."  He generally alleges that prisoners in the MCU are tortured, beaten, harassed and mistreated by the correctional officers in the MCU.  Prall states that the officers slap, punch, kick, club and threaten plaintiff both physically and mentally. He alleges that these attacks are ongoing.  Prall contends that he is treated this way to force him to modify his behavior and renounce his sincerely held religious beliefs.

"The Eighth Amendment's prohibition on 'cruel and unusual punishment' ... imposes on [prison officials] a duty to provide 'humane conditions of confinement.'"  Betts v. New Castle Youth Development, 621 F.3d 249, 256 (3d Cir. 2010)(quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994), cert. denied, 2011 WL 196324 (2011)).  That is, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  Id. (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)).  For an alleged deprivation to rise to the level of an Eighth Amendment violation, it must "result in the denial of 'the minimal civilized measure of life's necessities.'"  Id. at 835 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1982)).

To state a claim under the Eighth Amendment, an inmate must allege both an objective and a subjective component.  Wilson v.

Seiter, 501 U.S. 294, 298 (1991); Counterman v. Warren County Corr. Fac., 176 Fed. Appx. 234, 238 (3d Cir. 2006).  The objective component mandates that "only those deprivations denying 'the minimal civilized measure of life's necessities' ... are sufficiently grave to form the basis of an Eighth Amendment violation."  Helling v. McKinney, 509 U.S. at 32 (quoting Rhodes, 452 U.S. at 346).  This component requires that the deprivation sustained by a prisoner be sufficiently serious, for only "extreme deprivations" are sufficient to make out an Eighth Amendment claim.  Hudson v. McMillian, 503 U.S. 1, 9 (1992).

The subjective component requires that the state actor have acted with "deliberate indifference," a state of mind equivalent to a reckless disregard of a known risk of harm.  See Farmer v. Brennan, 511 U.S. 825, 835 (1994); Wilson, 501 U.S. at 303.  A plaintiff may satisfy the objective component of a conditions-of-confinement claim if he can show that the conditions alleged, either alone or in combination, deprive him of "the minimal civilized measure of life's necessities," such as adequate food, clothing, shelter, sanitation, medical care, and personal safety.  Rhodes, 452 U.S. at 347-48; Young v. Quinlan, 960 F .2d 351, 364 (3d Cir.1992).  However, while the Eighth Amendment directs that convicted prisoners not be subjected to cruel and unusual punishment, "the Constitution does not mandate comfortable prisons."  Rhodes, 452 U.S. at 349.  To the extent that certain conditions are only "restrictive" or "harsh," they are merely part of the penalty that criminal offenders pay for their

offenses against society.  Id. at 347.  An inmate may fulfill the subjective element of such a claim by demonstrating that prison officials knew of such substandard conditions and "acted or failed to act with deliberate indifference to a substantial risk of harm to inmate health or safety."  Ingalls v. Florio, 968 F. Supp. 193, 198 (D.N.J. 1997).

This Court finds that the allegations as set forth by Plaintiff, if true, may be sufficient at this preliminary screening stage to state an Eighth Amendment violation.  Prall has alleged facts to show that he has been deprived of basic clothing and sanitation needs, that his personal safety is at risk and that he has been denied medical care.  He also has alleged that the defendants acted with deliberate indifference to these substandard conditions and the physical abuse intentionally inflicted on Plaintiff.

Indeed, with regard to his claims of physical abuse and excessive force, Prall has alleged that correctional officers have slapped his face, stomped on his toes and fingers, sprayed mace in his eyes, nose, throat and on his genitals and rectal areas.  He has been poked with needles, kicked with boots, punched, and electrocuted with devices that burn holes in rugs. Where plaintiff's claim asserts excessive use of force, the core inquiry as to the subjective component is that set out in Whitley v. Albers, 475 U.S. 312, 320-21 (1986)(citation omitted):
"'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very

purpose of causing harm.'"  Quoted in Hudson, 503 U.S. at 6.

"When prison officials maliciously and sadistically use force to

cause harm, contemporary standards of decency always are

violated."  Id. at 9.  In such cases, a prisoner may prevail on

an Eighth Amendment claim even in the absence of a serious

injury, the objective component, so long as there is some pain or

injury and something more than de minimis force is used.  Id. at

9-10 (finding that blows which caused bruises, swelling, loosened

teeth, and a cracked dental plate were not de minimis for Eighth

Amendment purposes).

     To determine whether force was used in "good faith" or

"maliciously and sadistically," courts have identified several

factors, including:

> (1) "the need of the application of force"; (2) "the
> relationship between the need and the amount of force
> that was used"; (3) "the extent of injury inflicted";
> (4) "the extent of the threat to the safety of staff
> and inmates, as reasonably perceived by responsible
> officials on the basis of the facts known to them"; and
> (5) "any efforts made to temper the severity of a
> forceful response."

Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting

Whitley v. Albers, 475 U.S. at 321).  Thus, not all use of force

is "excessive" and will give rise to the level of a

constitutional violation.  See Hudson, 503 U.S. at 9 (it is clear

that not "every malevolent touch by a prison guard gives rise to

a federal cause of action").  Therefore, "[n]ot every push or

shove, even if it may later seem unnecessary in the peace of a

judge's chambers, violates a prisoner's constitutional rights."
Id. at 9-10.

Here, the allegations as set forth above, if true, may
suggest a claim that defendants acted in a malicious and
excessive manner.  Moreover, it appears that Prall has alleged
more than de minimis injury.[15]  Therefore, Prall's Eighth
Amendment claims alleging unconstitutional conditions of
confinement and use of excessive force and physical abuse will be
allowed to proceed at this time as against the following NJSP
defendants: Michelle R. Ricci; William J. Moliens; Chris Holmes;
Jimmy Barnes; James Drumm; Ron Wagner; James Keil; Lt. Alaimo;
Sgt. Ortiz and Captain Ortiz; and John Roes 1-99, the unknown
correctional officers and SID investigators at NJSP.

J.  Excessive Force Claim Against MCCC Defendants

Prall also alleges that he was attacked and beaten by MCCC
correctional officers on December 12, 2009, and then denied
medical care for his injuries.  Prall contends that defendants
Bocchini, Sypek, Ellis, Hughes, Ganges, Mair, Blaney, Crowley and
Oliver had correctional officer defendants McCall, Williams,
Wilkie and John Doe MCCC officers "stage a pretextual disturbance

---

[15]  "[T]he Eighth Amendment analysis must be driven by the
extent of the force and the circumstances in which it is applied;
not by the resulting injuries."  Smith v. Mensinger, 293 F.3d
641, 648 (3d Cir. 2002).  Thus, the pivotal inquiry in reviewing
an excessive force claim is whether the force was applied
maliciously and sadistically to cause harm.  Id. at 649; Brooks,
204 F.3d at 106.  Otherwise, an inmate "could constitutionally be
attacked for the sole purpose of causing pain as long as the
blows were inflicted in a manner that resulted" in injuries that
were de minimis.  Id.

for Prall to be attacked."  The correctional officers allegedly placed Prall in a choke hold and twisted his arms and wrists to the point that it felt like his bones would break.  Defendants Williams, Wilkie, Morris and Nurse Pete[16] allegedly told Prall that he can sue them all he wants, he does not have rights.

These allegations by Prall, if true, support a claim that defendants McCall, Williams, Wilkie and the John Doe MCCC officers who participated in the December 12, 2009 alleged attack acted in a malicious and excessive manner.  Prall also alleges more than de minimis injury.  Therefore, the Court will allow this excessive force claim to proceed as against these defendants only.  Prall's general allegation that the supervisory defendants Bocchini, Sypek, Ellis, Hughes, Ganges, Mair, Blaney, Crowley and Oliver ordered the attack is nothing more than a bald accusation premised only on a legal conclusory statement, not fact, which is not entitled to the assumption of truth.  Iqbal, 129 S.Ct. at 1950.  Accordingly, this excessive force claim will be dismissed without prejudice, as against defendants Bocchini, Sypek, Ellis, Hughes, Ganges, Mair, Blaney, Crowley and Oliver, for failure to state a claim at this time.

K.  Free Exercise Claims

    1.  *First Amendment Claim*

---

[16]  Nurse Pete allegedly discharged Prall from medical treatment without giving him anything for muscle pain and ringing in his ears.  Prall states that he had these symptoms for three weeks.

Prall asserts that his First Amendment right to free
exercise of religion has been violated by defendants.  Prall
states that he is a "Five Percenter" or "Nation of Gods and
Earth" ("NOGE") member and a conscientious objector to
participation in the state criminal justice system based on his
religious beliefs.  He does not articulate any facts to show that
the actual practice of his faith is circumscribed in any
particular way.  Rather, Prall seems to suggest that he is being
forced to choose between his religious beliefs, which rejects
participation in state court criminal proceedings, and
challenging state court criminal actions.  He also alleges that
his placement in the MCU at NJSP violates his free exercise
rights because he allegedly must renounce his beliefs if he wants
to participate in rehabilitative, educational or work programs.
It is plain that Prall has chosen to adhere to his religious
beliefs, and has not participated in any meaningful way in
defending himself in state court criminal proceedings,
challenging his criminal conviction via the state court review
process, or submitting to a competency evaluation or prison rules
and regulations.

"Prison walls do not form a barrier separating prison
inmates from the protections of the Constitution."  Turner v.
Safley, 482 U.S. 78, 84 (1987)).  Nevertheless, the Supreme Court
recognized that inmates' constitutional rights must be evaluated
within the context of their incarceration, and will in some
respects be limited in order to accommodate the demands of prison

administration and to serve valid penological goals.  Id.; see also Fraise v. Terhune, 283 F.3d 506, 517 (3d Cir. 2002). Because "courts are ill equipped to deal with the increasingly urgent problems of prison administration" and because the administration of prisons is "peculiarly within the province of the legislative and executive branches of government," courts must defer to prison officials who oversee its many security, discipline, and administrative functions.  Turner, 482 U.S. at 84-85 (citations and internal quotation marks omitted); Fraise, supra.  For this reason, the test to determine whether a prison policy violated an inmate's right to free exercise of religion is one of reasonableness.  Turner, 482 U.S. at 89 (citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987)).  A prison regulation is "valid if it is reasonably related to legitimate penological interests."  Turner, 482 U.S. at 89.

This determination is conducted by weighing the four factors set forth in Turner.  First, whether the regulation bears a "valid, rational connection" to a legitimate and neutral governmental objective.  Second, whether prisoners have alternative ways of exercising the circumscribed right.  Third, whether accommodating the right would have a deleterious impact on other inmates, correctional officers, and the allocation of prison resources generally.  And fourth, whether alternatives exist that "fully accommodate[] the inmate's rights at de minimis cost to valid penological interests."  Id., 482 U.S. at 91.

70

Thus, this Court must determine (1)"whether there is a valid, rational connection between the regulation" and the asserted government interest; (2) whether Prall was "deprived of all forms of religious exercise or whether [he was] able to participate in other observances of [his] faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any obvious, easy alternatives to the challenged regulation." Id.; see also Fraise, 283 F.3d at 516.

In this case, Prall does not allege any facts to show that his right to the free exercise of his religion has been violated in prison.  He generally alleges that NJSP defendants refuse to process his grievances about the conditions of his confinement or his administrative appeals from the MCURC's decisions concerning his classification unless Prall renounces his religious beliefs. Yet, Prall does not allege that he actually has filed administrative grievances and appeals apart from the numerous civil complaints he has filed in state and federal court. Indeed, Prall alleges that his beliefs prevent him from cooperating with the state criminal justice process, including compliance with state prison rules and regulations.  Moreover, Prall's assertion that he was transferred and remains confined in the MCU based on his religious beliefs is belied by Prall's admitted institutional disciplinary record and criminal history. Consequently, when reviewed as a whole, Prall's general allegations of a First Amendment free exercise of religion

violation are nothing more than a loose and threadbare recital of legal conclusory statements, which are not sufficient under Rule 8 to state a cognizable claim.  See Iqbal, 129 S.Ct. at 1949-50. Therefore, Prall's First Amendment claim asserting denial of his free exercise of religion will be dismissed in its entirety as against all named and unnamed NJSP defendants for failure to state a claim.

    2.  *RLUIPA Claim*

Prall also asserts that his statutory rights under the Religious Land Use and Institutionalized Persons Act of 2000, ("RLUIPA"), 42 U.S.C. § 2000cc-1, have been violated.  Section 2000cc-1 provides that "[n]o government shall impose a substantial burden on the religious exercise of" an institutionalized person, "even if the burden results from a general applicability, unless the government demonstrates that imposition of the burden on that person --

> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest."

42 U.S.C. § 2000cc-1(a).

The term "religious exercise" is broadly defined by RLUIPA to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  The term "substantial burden" is not defined by RLUIPA.  The United States Court of Appeals for the Third Circuit has found "substantial burden" to exist, for RLUIPA purposes,

where: "(1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; or (2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." Washington v. Klem, 497 F.3d 272, 280 (3d Cir. 2007).

Nevertheless, the Supreme Court has noted that RLUIPA is not to be read as "to elevate accommodation of religious observances over an institution's need to maintain order and safety." Cutter v. Wilkinson, 544 U.S. 709, 722 (2005). Instead, Congress intends for courts to give "'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" Id., 544 U.S. at 722-23 (quoting S.Rep. No. 103-111, at 10, U.S.C.C.A.N. 1993, PP. 1892, 1899, 1900).

In this case, Prall alleges that he has been told that he must "renounce" his religious beliefs in order to participate in work, rehabilitative and educational programs in the MCU. Prall contends that unless he renounces his religious beliefs, he will remain on "noncongregate" status in the MCU, which will prolong his confinement in the MCU. Thus, Prall is alleging that he is being pressured to violate his beliefs and that he is being forced to choose between his religious beliefs and receiving a

73

benefit available to other prisoners, in violation of his statutory rights under RLUIPA.

While the Court notes that Prall does little more than utter the basic elements of a free exercise claim under RLUIPA, without specific factual support, it is enough to pass muster at this preliminary screening stage.  However, Prall does not identify any defendants who allegedly told him he must renounce his religious beliefs to receive the benefits other prisoners have at the MCU at NJSP.  Accordingly, the RLUIPA claim may proceed only after Plaintiff amends his Amended Complaint to identify the proper defendants.

L.  Equal Protection Claim

Next, Prall asserts that defendants have unconstitutionally discriminated against him for his sincerely held beliefs as a conscientious objector to participation in his state criminal proceedings.  Prall appears to argue that his moral compulsion should be treated similarly to individuals who have been found to be mentally incompetent to stand trial.

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike.  City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (citing Plyler v. Doe, 457 U.S. 202, 216 (1982); Artway v. Attorney General of New Jersey, 81 F.3d 1235, 1267 (3d Cir. 1996).  Despite its sweeping

language, though, "[t]he Equal Protection Clause does not forbid classifications.  It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."  Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).

Proof of disparate impact alone, however, is not sufficient to succeed on an equal protection claim; a plaintiff also must prove that the defendant intended to discriminate.  Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 264-66 (1977); Washington v. Davis, 426 U.S. 229, 242, 244-45 (1976).  Thus, discriminatory intent must be a motivating factor in the decision, but it need not be the sole motivating factor.  Village of Arlington Heights, 429 U.S. at 265-66.

Under this standard, the Court finds that Prall has failed to articulate an equal protection violation.  He does not allege that he has been singled out for discriminatory treatment different from other similarly situated prisoners in the MCU; indeed, he alleges that MCU inmates alike are subjected to the conditions and abuse, which he purports to have been visited upon him.  Moreover, inmates are not members of a suspect class.  See Myrie v. Comm'r, N.J. Dept. Of Corrections, 267 F.3d 251, 263 (3d Cir. 2001)(noting that inmates, as a class, do not constitute a "discrete and insular" minority); Abdul-Akbar v. McKelvie, 239 F.3d 307 (3d Cir.), cert. denied 533 U.S. 953 (2001).  Finally, Prall provides no legal authority for his contention that his moral compulsion should be treated the same as a person who has been found incompetent to stand trial.  Rather, it appears that

this claim is a back door attempt to undermine or challenge his state court conviction, which is more appropriately raised in his direct appeal or in a federal habeas action after his state court review has been exhausted.  Therefore, this Court concludes that Prall has failed to allege any equal protection violation and this claim will be dismissed accordingly.

M.   Retaliation Claim

Next, Prall appears to argue that defendants are retaliating against him for his religious beliefs.  He alleges that defendants refuse to process his grievances about the conditions of his confinement or his administrative appeals concerning the MCURC's decisions to keep plaintiff in the MCU and under a non-congregate status, solely to force Prall to renounce his religious beliefs.  Prall further asserts that the defendants have retaliated against him to inhibit his First Amendment right of access to the courts.  In particular, he alleges that he was transferred to the MCU in retaliation for helping other inmates at the MCCC file lawsuits and after Prall had received a copy of the transcript from his extradition proceedings.

"Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution ... ."  White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir. 1990).  To prevail on a retaliation claim, plaintiff must demonstrate that (1) he engaged in constitutionally-protected activity; (2) he suffered, at the hands of a state actor, adverse action "sufficient to deter a person of ordinary firmness from

exercising his [constitutional] rights;" and (3) the protected activity was a substantial or motivating factor in the state actor's decision to take adverse action. Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001) (quoting Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)). See also Anderson v. Davila, 125 F.3d 148, 160 (3d Cir. 1997) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)); Thaddeus-X v. Blatter, 175 F.3d 378, 386-99 (6th Cir. 1999), cited with approval in Allah, 229 F.3d at 225.

Based on the allegations as set forth above, this Court finds that Prall has failed to state a claim. Prall merely asserts threadbare recitals of the elements of a cause of action for retaliation, supported only by bare legal conclusory statements, which is not sufficient under Rule 8 to state a cognizable claim. See Iqbal, 129 S.Ct. at 1949-50. First, Prall alleges that he was transferred to the MCU because he refused to participate in his criminal proceedings. However, the Court observes that Prall was transferred from MCCC to the MCU at NJSP only after he was sentenced on his conviction in absentia. Moreover, Prall admits that his placement in the MCU was based on his past criminal and institutional history, as well as his past threats to government officials. Thus, as alleged, these facts do not show that Prall's "conscientious objection" beliefs were a substantial or motivating factor for his transfer to the MCU.

Further, Prall does not have a constitutionally protected right to help other inmates file lawsuits. He also fails to show

how he was deterred in any way from filing his own lawsuits.
Prall has been a persistent and frequent litigant in both the
state court and this federal court, having filed numerous actions
since he was extradited to New Jersey.

Finally, while Prall alleges that defendants refuse to
process his grievances and administrative appeals, he
simultaneously contends that he conscientiously objects to
participate in the state criminal justice system.  He does not
allege any grievance or administrative appeal that he had filed,
let alone one that was declined.  Therefore, Prall's claims of
retaliation under either the First or Fourth Amendments will be
dismissed for failure to state a claim at this time.

N.   <u>Claims Against AKFC Defendants</u>

Prall was committed to the AKFC for a 30-day competency
evaluation on September 22, 2009.  He was discharged on October
8, 2009, before the 30-day period was completed.  Prall admits
that he did not cooperate with the psychological testing and
evaluation because of his beliefs as a conscientious objector.
Prall alleges that during this 17-day commitment, the treatment
team and other AKFC defendants treated him in an "oppressive,
abusive, egregious and irrational manner" because Prall's moral
compulsion not to participate in the state criminal process did
not fit into any psychological diagnostic conclusion.  Prall also
complains that he was denied access to rehabilitation programs,
and other accommodations and privileges at the AKFC, but admits
that he was foreclosed from these privileges due to his refusal

to cooperate.  Finally, Prall alleges that he was kept in a locked ward where his cell allegedly was flooded with urine and feces, and he was subjected to constant noise that prevented him from sleeping at night.

It is plain from the factual allegations made by Prall himself, that his 30-day evaluation was shortened to 17 days due to his refusal to cooperate.  Moreover, the Court finds no denial of psychiatric treatment based on these allegations.  Rather, Prall simply disagrees with the AKFC staff's psychological assessment that does not contemplate a moral compulsion or conscientious objection as a mental incompetency.  The short duration of Prall's stay at AKFC, as alleged by Prall, is insufficient to rise to the level of a constitutional deprivation.  Therefore, the Complaint and Amended Complaint will be dismissed with prejudice, in their entirety, as against all named AKFC defendants.

O.   Ninth Amendment Claim

Prall further asserts that defendants have violated his rights under the Ninth Amendment.  Prall seems to argue that the Ninth Amendment protects his belief in the Declaration of Independence that citizens should revolt against an oppressive government.

The Ninth Amendment states: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."  The Ninth Amendment does not independently provide a source of individual

constitutional rights.  See, e.g.,  Perry v. Lackawanna County Children & Youth Services, 345 Fed. Appx. 723, 726 (3d Cir. 2009); Jenkins v. C.I.R., 483 F.3d 90, 92 (2d Cir.), cert. denied, 552 U.S. 821 (2007); Schowengerdt v. United States, 944 F.2d 483, 490 (9th Cir. 1991), cert. denied, 503 U.S. 951 (1992). The Supreme Court held that the Ninth Amendment does not provide an independent basis for asserting a civil rights claim; rather, a section 1983 claim must be premised on a specific constitutional guarantee.  See Griswold v. Connecticut, 381 U.S. 479, 484 (1965); Onyiuke v. New Jersey, 242 Fed. Appx. 794, 797 (3d Cir. 2007); Zeller v. Donegal Sch. Dist. Bd. of Ed., 517 F.2d 600, 605 n. 26 (3d Cir. 1975).

    Accordingly, the Court will dismiss Prall's claim under the Ninth Amendment in which he asserts his right to revolt.

P.  Self-Incrimination and Presumption of Innocence Claim

    Prall further alleges that application of N.J.A.C. 10A:5-2.4, 2.6 and 2.7 violate his right to a presumption of innocence and his privilege against self-incrimination under the Fifth Amendment.  These regulations encompass the criteria, procedures and appeal process regarding the assignment of inmates to the MCU.  Prall does not allege how these regulations impinge on his rights, but rather makes the bald conclusory statement that these regulations violate his privilege against self incrimination and the presumption of innocence.  Without more, Prall's claim asserting only legal conclusions and no facts must be dismissed pursuant to Iqbal.

Q.  <u>Preliminary Injunction Motion</u>

Finally, Prall brings an application for a preliminary injunction with respect to recognition of his moral compulsion or conscientious objection and for injunctive relief on his other claims.

To secure the extraordinary relief of a preliminary injunction or TRO, plaintiff must demonstrate that "(1) he is likely to succeed on the merits; (2) denial will result in irreparable harm; (3) granting the injunction will not result in irreparable harm to the defendants]; and (4) granting the injunction is in the public interest." <u>Maldonado v. Houston</u>, 157 F.3d 179, 184 (3d Cir. 1998), <u>cert. denied</u>, 526 U.S. 1130 (1999)(as to a preliminary injunction); <u>see also</u> <u>Ballas v. Tedesco</u>, 41 F. Supp.2d 531, 537 (D.N.J. 1999) (as to temporary restraining order).  A plaintiff must establish that all four factors favor preliminary relief.  <u>Opticians Ass'n of America v. Independent Opticians of America</u>, 920 F.2d 187 (3d Cir. 1990). The standards for a permanent injunction are essentially the same as for a preliminary injunction, except that the plaintiff must show actual success on the merits, not a likelihood of success, to obtain a permanent injunction.  <u>See</u> <u>University of Texas v. Camenisch</u>, 451 U.S. 390, 392 (1981).

Here, Prall's allegations concerning the ongoing physical attacks against him while he is confined in the MCU, if true, are sufficient at this time to satisfy the first requirement that he may be likely to succeed on the merits.  Additionally, such

81

allegations of physical harm and abuse also demonstrate that Prall may be subject to irreparable harm.  Further, to the extent that the allegations of physical abuse by the correctional officers may be true, as alleged, granting an injunction would be in the public interest and would not likely result in irreparable harm to defendants because such conduct by the defendants is unlawful.

However, before the Court can grant a preliminary injunction on ex parte allegations, it is appropriate to compel the defendants to respond promptly to Prall's claim of physical abuse.  Accordingly, the Court will direct the NJSP defendants, namely, Michelle R. Ricci, William J. Moliens, Chris Holmes, Jimmy Barnes, James Drumm, Ron Wagner, James Kiel, Lt. Alaimo, Sgt. Ortiz and Captain Ortiz, to respond in writing to this Court, within ten (10) days from the date the NJSP defendants are served with this Court's Order accompanying this Opinion, as to Prall's allegations of ongoing physical abuse.

Further, while Prall has not requested appointment of counsel on his behalf in this matter, the Court is inclined to consider such application for Prall and recommend appointment of counsel given the limitations he may face while confined in the MCU in obtaining discovery and actively litigating this claim.

Finally, as to the remaining claims in Prall's motion for a preliminary injunction, and in particular, his demand for recognition of his moral compulsion or conscientious objection, the Court will deny preliminary injunctive relief.  Prall has not

alleged facts sufficient to satisfy the first requirement that he will likely succeed on the merits.  For instance, most all of the claims asserted in this Complaint are being dismissed for failure to state a claim at this time.  The RLUIPA claim is proceeding on the barest of allegations once Prall identifies the proper defendants.  Most significantly, Prall fails to articulate irreparable harm with regard to these other claims, and thus, cannot satisfy the second mandatory requirement.

Therefore, because Prall is unable to establish all four factors necessary for preliminary injunctive relief on all of the remaining claims (other than his claim of ongoing physical abuse in the MCU), as required, his application for preliminary injunctive relief must be denied with respect to those claims at this time.

IV.  CONCLUSION

For the reasons set forth above, all claims in the Complaint and Amended Complaint that attempt to challenge Prall's state court conviction, sentence and/or extradition will be dismissed without prejudice as against all named defendants, pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1), for failure to state a claim upon which relief may be granted at this time.  Prall's claims against the Mercer County Prosecutor defendants, namely, Bocchini and Galuchie, will be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(iii) and 1915A(b)(2).  Further, the Complaint and Amended Complaint will be dismissed without prejudice, in their entirety, as against defendants Sypek, Blair, Hughes, Ganges,

Mair, Blaney and Crowley, pursuant to 28 U.S.C. §§
1915(e)(2)(B)(ii) and 1915A(b)(1), for failure to state a viable
claim based on more than mere supervisor liability at this time.
Next, plaintiff's claims asserting conspiracy, retaliation,
denial of access to courts, and denial of his First Amendment
right to free exercise of religion, will be dismissed without
prejudice for failure to state a claim at this time.  In
addition, plaintiff's claims asserting deprivation of property,
denial of due process based on his MCU placement and
classification, denial of due process based on false disciplinary
charges, denial of equal protection, denial of his Ninth
Amendment right to revolt and denial of his rights against self-
incrimination and to a presumption of innocence, will be
dismissed with prejudice for failure to state a claim, pursuant
to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).  Likewise,
plaintiff's claims against the AKFC defendants will be dismissed
with prejudice for failure to state a claim, pursuant to 28
U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).  However,
Plaintiff's claims alleging unconstitutional conditions of
confinement and excessive force in violation of his Eighth and
Fourteenth Amendment rights will be allowed to proceed at this
time as to NJSP defendants, Michelle R. Ricci; William J.
Moliens; Chris Holmes; Jimmy Barnes; James Drumm; Ron Wagner;
James Keil; Lt. Alaimo; Sgt. Ortiz and Captain Ortiz; and John
Roes 1-99, the unknown correctional officers and SID
investigators at NJSP; and the MCCC defendants, McCall, Williams,

Wilkie and the John Doe MCCC officers.  Plaintiff's claim

asserting denial of free exercise of religion in violation of

RLUIPA will be allowed to proceed, however, plaintiff must amend

his Complaint to name the appropriate NJSP defendants with

respect to this claim within 30 days from entry of the

accompanying Order.  Finally, Prall's motion for preliminary

injunctive relief (Docket entry no. 18) will be denied at this

time, except with respect to his claim of ongoing physical abuse.

As to that claim, the Court will direct the NJSP defendants,

namely, Michelle R. Ricci, William J. Moliens, Chris Holmes,

Jimmy Barnes, James Drumm, Ron Wagner, James Kiel, Lt. Alaimo,

Sgt. Ortiz and Captain Ortiz, to respond in writing to this

Court, within ten (10) days from the date the NJSP defendants are

served with this Court's Order accompanying the Opinion,

concerning Prall's allegations of ongoing physical abuse, and to

show cause why an injunction should not be issued against the

defendants.  An appropriate order follows.


                                        /s/ Freda L. Wolfson
                                   FREDA L. WOLFSON
                                   United States District Judge

Dated:  September 23, 2011